**IOWA COAL MINING CO., INC., Star Coal Mining Co., Inc., and Jim Huyser, Appellees,**

v.

**MONROE COUNTY, Iowa, Appellant.**

No. 95–198.

Supreme Court of Iowa.

Oct. 23, 1996.

Rehearing Denied Nov. 18, 1996.

Lee H. Gaudineer, Jr., and H. Loraine Wallace of Austin, Gaudineer, Austin, Salmons, Swanson & Hopkins, Des Moines, and William S. Owens, County Attorney, for appellant.

R. Jeffrey Lewis, Joseph G. Van Winkle, and S.P. DeVolder of Lewis, Webster, Johnson, Van Winkle & DeVolder, Des Moines, for appellees Iowa Coal and Star Coal.

Randall C. Stravers and James Q. Blomgren of Pothoven, Blomgren & Stravers, Oskaloosa, for appellee Huyser.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, SNELL, and ANDREASEN, JJ.

LAVORATO, Justice.

The plaintiffs in this case are a coal mining company, its parent company, and the sole stockholder of the parent company. The defendant is the county in which the coal mining operation is located. The county passed a county-wide zoning ordinance that affected the use of two sites (Star 6 and Star 14) belonging to the coal mining company. The coal mining company intended to use the sites as a combined coal mining and landfilling operation. The county's adoption of the ordinance led to a lawsuit between the parties that eventually came before our court on the county's appeal. *See Iowa Coal Mining Co. v. Monroe County*, 494 N.W.2d 664 (Iowa) (*Iowa Coal I* ), *cert. denied*, 508 U.S. 940, 113 S.Ct. 2415, 124 L.Ed.2d 638 (1993).

In *Iowa Coal I*, we concluded as to Star 14 the ordinance (1) was validly enacted, (2) was a valid exercise of the county's police power, and (3) did not effect a regulatory taking of the site. As to Star 6, we concluded the

takings claim arising from the enactment of the ordinance was not ripe for adjudication. We therefore reversed and remanded this claim for dismissal as premature.

The plaintiffs then brought the present action after the county passed a new but almost identical zoning ordinance. The plaintiffs again alleged a regulatory takings claim regarding Star 6. The plaintiffs also alleged (1) there were nonconforming uses for landfilling at both sites and (2) the county tortiously interfered with the companies' prospective contractual relationships regarding Star 6. The district court awarded damages on the takings claim and the tortious interference claim.

The county appeals, raising numerous issues. We reverse and remand for dismissal of the takings claims regarding Star 6. On remand, the district court shall vacate the judgments it rendered on the takings claim. We likewise reverse and remand for dismissal of the claims regarding the nonconforming use status for the two sites. We affirm the award on the tortious interference claim.

I. *Background Facts.*

Iowa Coal Mining Company and Star Coal Mining Company are corporations with their principal place of business in Monroe County, Iowa (County). Iowa Coal Mining Company is the sole shareholder of Star Coal Mining Company. James Huyser is the president and sole shareholder of Iowa Coal Mining Company. Hereinafter, unless otherwise indicated and for convenience, we collectively refer to James Huyser, Iowa Coal Mining Company, and Star Coal Mining Company as Iowa Coal.

Iowa Coal originally engaged in coal strip mining. It holds leases on three relevant properties in the County: (1) Star 6, (2) Star 14, and (3) Star 15. Huyser is the lessee on all three leases, but he assigned the leases to Iowa Coal in return for royalty payments.

Iowa Coal became interested in landfilling in 1984 and obtained a sanitary landfilling permit from the Iowa Department of Natural Resources (IDNR) for 10.3 acres of Star 6. The Star 6 site contains 120 acres. On May 13, 1988, Iowa Coal received a comparable permit for the Star 14 site. Apparently add-

ing landfilling to a coal strip mining operation is relatively easy because both operations require essentially the same equipment. Iowa Coal already possessed all the equipment necessary for landfilling, except for a trash compactor.

Between 1984 and 1987, Iowa Coal expended lots of time and money to prepare Star 6 and Star 14 for landfilling. Iowa Coal engaged in the following prelandfilling activities at both sites: (1) lease negotiation and execution, (2) advance royalty and lease payments, (3) employment of a consultant and development of site plans, (4) installation of monitoring wells and drill holes, (5) completion of the IDNR permit processes, (6) market plans and contract negotiations, and (7) other necessary and essential activities for landfilling operations.

County officials made it clear that they are opposed to the concept of combining strip mining and landfilling. On May 12, 1988—one day before Iowa Coal obtained the landfilling permit for Star 14—the County enacted ordinance 6. Ordinance 6 is a county-wide ordinance aimed at curtailing—and ultimately extinguishing—all nonconforming uses in existence at its adoption. Not surprisingly, ordinance 6 designated coal mining and landfilling nonconforming uses.

The original draft of ordinance 6 allowed both landfilling and mining as conditional uses in A–1 and A–2 agricultural districts. Star 6 and Star 14 are located in an A–2 district.

Later the County revised the draft. The revised draft permitted mining—but not landfilling—as a conditional use in A–1 and A–2 agricultural districts. The revised draft permitted landfilling—but not mining—as a conditional use on I–2 (heavy industrial) land. These changes meant that Iowa Coal could continue strip mining but could not combine the operation with a landfill. The County eventually enacted this revised draft into law.

After the County adopted ordinance 6, the conflict between the parties began to escalate. The harder Iowa Coal tried to keep its business afloat, the harder the County tried to sink it. For example, the County had historically granted Iowa Coal permission to

mine through a County road. On the pretext that such a practice would damage county roads, the County rescinded the permission on February 19, 1988. In the fall of 1988, the County denied Iowa Coal's application to rezone its property. In addition—largely because of the County's actions—Iowa Coal lost landfilling business from sources inside and outside of Iowa.

The differences between Iowa Coal and the County arising from ordinance 6 led to *Iowa Coal I*. In *Iowa Coal I*, Iowa Coal filed suit in district court challenging the validity of ordinance 6. The suit sought relief by way of certiorari and declaratory judgment. Iowa Coal alleged the illegality of ordinance 6, claimed the ordinance deprived Iowa Coal of the only legitimate use of its property without providing just compensation, and sought damages. The district court concluded that the County violated Iowa Code section 358A.5 (1987) because it failed to develop an independent planning document before enacting ordinance 6. The court awarded damages of $10,319,526 to Iowa Coal and $5,047,972 to Huyser for lost lease royalties.

Following the County's appeal, we came to the following conclusions. First, section 358A.5 does not mandate an independent planning document before enacting a zoning ordinance, and the district court erred in invalidating ordinance 6 on that ground. *Iowa Coal I*, 494 N.W.2d at 671.

Iowa Coal also urged affirmance on the grounds that an unconstitutional taking had occurred. *Id.* Iowa Coal asserted that the County's enactment of ordinance 6 denied Iowa Coal the only legitimate use of its property. *Id.* As a result, Iowa Coal claimed, it was forced to shut down, causing it substantial and irreparable damage. *Id.* at 670. The district court had not addressed the takings claim, but we did so on the familiar principle that a party may attempt to save a judgment in its favor on any ground asserted in the district court. *Id.* at 668. After considering this claim, we reached our second conclusion: ordinance 6 was a valid exercise of the County's police power that did not effect a regulatory taking of Star 14. *Id.* at 671.

Last, we did not reach the takings claim arising from Star 6 because this claim was not ripe for adjudication. We explained:

Iowa Coal's claim for the Star 6 site fails for a different reason. As noted earlier in this opinion, Iowa Coal held a valid state permit to accept certain wastes at Star 6, and was using the mine as a landfill on a limited basis before the enactment of ordinance 6. The ordinance expressly allows existing nonconforming uses to continue. The record reveals, however, that Iowa Coal never sought to take advantage of this section of the ordinance.

Unless a claimant exhausts available state remedies, a court is without jurisdiction to entertain a claim that the economic viability of the property has been substantially impaired by the zoning ordinance. Iowa Coal's claim as it pertains to Star 6 was not ripe for adjudication. Accordingly, we reverse and remand this claim for dismissal as premature.

*Iowa Coal I,* 494 N.W.2d at 671–72 (citation omitted).

On August 7, 1990, the County replaced ordinance 6 with ordinance 7. Ordinance 7 is identical to ordinance 6 in all material respects. Ordinance 7 came about because the County incorrectly guessed this court would affirm the district court's ruling in *Iowa Coal I.* (Our decision in *Iowa Coal I* came down in 1993.) As we mentioned, the district court had ruled that the County violated Iowa Code section 358A.5 because it failed to adopt a comprehensive plan prior to the enactment of ordinance 6. Both ordinances remain on the books.

During the litigation, Iowa Coal's latest landfilling permits for Star 6 and Star 14 expired. Iowa Coal submitted a renewal application to the IDNR before its last permit for Star 6 expired on January 5, 1990. Iowa Coal also submitted a renewal application to the IDNR for Star 14 before that permit expired in 1991.

In June 1990 Iowa Coal agreed with George Ide and Associates to convey Star 6 and Star 14—along with the landfilling permits on each—for $5 million and an estimated $4 million in future royalty payments. The agreement failed because the County refused to cooperate with Ide and actively interfered with potential landfill customers.

The long-running feud between the County and Iowa Coal took a heavy financial toll on the company. Between 1987 and August 1990, Iowa Coal laid off most of its employees and substantially curtailed its operations.

II. *Background Proceedings.*

On May 7, 1993, several months after our decision in *Iowa Coal I,* Iowa Coal filed a three count petition against the County. Count I sought a declaratory judgment that Iowa Coal possessed nonconforming use rights to mine coal and conduct landfilling activities on portions of Star 6 under ordinance 6 and its successor, ordinance 7. As to Star 6, the petition alleged that our decision in *Iowa Coal I* "did not reject the constitutional takings claim on Star 6 but decided, without explanation or reference to any provision of the ordinances, that the claim was premature." In the alternative, Count I asked the court to state why the constitutional takings claim relative to Star 6 was premature and to direct what actions were necessary to make the claim ripe for judicial determination. Finally, Count I asked the court to declare that those sections of ordinance 6 and ordinance 7 zoning Star 6 violated the Federal and Iowa Constitutions because the provisions were arbitrary, unreasonable, and capricious.

Count II sought a declaratory judgment that Iowa Coal possessed nonconforming use rights to mine coal and conduct landfilling activities on portions of Star 14 under ordinances 6 and 7. Count II also asked the court to declare that the sections of the ordinances zoning Star 14 violated the Federal and Iowa Constitutions because the provisions were arbitrary, unreasonable, and capricious.

Count III sought relief as to Star 15. The relief sought in Count III paralleled the relief sought in Count I. The district court granted no relief for Star 15, and Iowa Coal did not cross-appeal.

The County answered, generally denying the material allegations in each count. The answer also asserted several affirmative defenses. These included the following: (1) all claims arising from Star 14 were barred by res judicata or election of remedies under

our decision in *Iowa Coal I;* (2) the district court lacked subject matter jurisdiction because Iowa Coal failed to exhaust its administrative remedies; and (3) Iowa Coal lost whatever nonconforming use status it had as to Star 6 and Star 14 through nonuse as defined in ordinances 6 and 7.

Following a bench trial, the district court filed a ruling reaching the following conclusions. First, the constitutional takings issue as to Star 6 was ripe for determination on the merits. Second, Iowa Coal did not fail to exhaust any administrative remedies for establishing a nonconforming use because no such remedy existed under ordinances 6 and 7. Third, even if such a remedy existed under the ordinances, the remedy under the circumstances would have been fruitless and inadequate. Fourth, at the time the County adopted ordinances 6 and 7, coal mining and landfilling were existing nonconforming uses at Star 6 and Star 14. Fifth, these nonconforming uses had not expired through nonuse. Sixth, the County's adoption of ordinances 6 and 7 constituted a regulatory taking of Iowa Coal's property and Huyser's royalties from Star 6. Last, the County tortiously interfered with Iowa Coal's "business expectancy" as to Star 6.

In a separate judgment entry, the district court awarded the companies $850,000 in damages on the tortious interference claim and $3,045,304 in damages for a taking of Star 6. As part of the takings claim regarding Star 6, the court awarded Huyser $1,750,000 for lost royalties. Finally, the court declared coal mining and landfilling were existing nonconforming uses at the time ordinances 6 and 7 were adopted and such uses continued to the present.

The County moved for judgment notwithstanding the verdict. *See* Iowa R. Civ. P. 243. The County also filed a rule 179(b) motion asking the district court to rule on a number of issues it had not decided. *See* Iowa R. Civ. P. 179(b). The district court denied both motions and the County appealed.

We consider the following issues raised by the County:

A. Did the district court lack subject matter jurisdiction because Iowa Coal had no capacity to sue?

B. Were the constitutional claims regarding Star 6 ripe for adjudication?

C. Is there a cause of action against a municipality for tortious interference with a prospective business relationship?

D. Should the district court have sustained the County's motion for directed verdict regarding Iowa Coal's tortious interference claim?

E. Does the doctrine of res judicata bar the tortious interference claim and the nonconforming use claims?

F. Should the district court have dismissed the Star 15 claims for lack of evidence?

III. *Scope of Review.*

■■■ This case was filed at law. We review such actions for legal error. Iowa R.App. P. 4. The district court findings of fact have the force of a special verdict and are binding on us unless they are not supported by substantial evidence. *Pierce v. Farm Bureau Mut. Ins. Co.,* 548 N.W.2d 551, 553 (Iowa 1996). Evidence is substantial if a reasonable mind could find it adequate to reach the same findings. *Id.* Although the district court's findings of fact are binding on us, its conclusions of law are not. *Id.*

IV. *The Issues.*

A. *Did the district court lack subject matter jurisdiction because Iowa Coal had no capacity to sue?* The County preserved this issue for our review in its rule 179(b) motion. The issue arises out of the leases regarding Star 6 and Star 14. The Star 6 coal lease is dated August 18, 1978, and is for a term of "twenty years from the date hereof, and so long thereafter as coal is being mined by Lessee, or its successors and assigns from the above described land." The coal lease was amended on September 26, 1983. The amendment grants the lessee the "right under this lease to dispose of nonhazardous waste on the leased premises." The amendment also provides that "[d]isposal on the leased premises will cease 9 months after

all the economically mined coal has been removed."

There are three coal leases regarding Star 14. One is for five years and is dated December 8, 1986. The other two are for four years and are dated May 30, 1986. All three leases provide that they are "for a term of . . . years [four or five respectively], or as long as we are mining on adjacent lands from the date hereof, and so long thereafter as coal is being mined by Lessee."

In July 1987 the three coal leases regarding Star 14 were amended granting the lessee the right to "dispose of nonhazardous waste on the leased premises." All three amendments provide that "[d]isposal on the leased premises will cease 9 months after all the economically mined coal has been removed."

■ The County asserts that Iowa Coal's claims are predicated upon its alleged inability to landfill at Star 6 and 14 due to the passage of ordinances 6 and 7. The County contends that Iowa Coal's right to landfill arises from the amended leases. Under these leases and amendments, the County insists, Iowa Coal had no landfill rights and, therefore, had no cause of action against the County at the time the two ordinances were passed.

In support of its position, the County relies on (1) the language in the amendments that Iowa Coal's right to landfill on both sites expires nine months after all economically mined coal is removed and (2) Huyser's testimony. Huyser testified that all economically mined coal at Star 6 had been removed by 1987. The County therefore insists that Iowa Coal's landfill rights under the lease amendment regarding Star 6 had expired long before the County passed ordinances 6 and 7.

As to Star 14, the County points to Huyser's testimony that (1) no coal was ever mined on this site or on any land next to it and (2) no coal was mined on Star 14 because it would have been uneconomical. This testimony, the County asserts, proves that under the leases and amendments Iowa Coal's coal mining and landfilling rights on Star 14 had

expired before the County passed the two ordinances.

Iowa Coal had no cause of action when it sued, the County argues, because Iowa Coal had "no capacity to sue" thereby depriving the district court of subject matter jurisdiction.

■ The County's argument implicates three concepts: subject matter jurisdiction, capacity to sue, and cause of action. Subject matter jurisdiction refers to the authority of a court to hear and determine cases of the general class to which the proceeding in question belongs, not merely the particular case then occupying the court's attention. *Christie v. Rolscreen Co.,* 448 N.W.2d 447, 450 (Iowa 1989). A party or the court itself can assert lack of subject matter jurisdiction at any time. *State v. Ryan,* 351 N.W.2d 186, 187 (Iowa 1984). In addition, the parties may not agree to, or confer, subject matter jurisdiction. *Id.* The County is certainly not contending and cannot contend that the district court lacked authority to hear the type of cases to which this proceeding belongs.

■ Capacity to sue is seen as distinct from, although closely allied to, legal existence, or the quality of being a person in law, and the possession of the requisite interest to support an action, or "standing," to sue. Capacity relates to a party's personal or official right to litigate the issues presented by the pleadings. Want of capacity to sue has reference, not to the existence of a plaintiff, but to legal disability, such as infancy, mental incompetence, and the like, which deprives a party of the right to come into court. Lack of capacity merely deprives a party of the right to come into court. *It does not go to the existence of a cause of action.* 59 Am.Jur.2d *Parties* § 24, at 410 (1987) (emphasis added). In short, a party must have capacity to sue before the party may commence and maintain a cause of action. *See Troester v. Sisters of Mercy Health Corp.,* 328 N.W.2d 308, 312–14 (Iowa 1982). However, lack of capacity does not relate to jurisdiction of the court; it only relates to any legal disability that deprives a party of the right to come into court. *Haddock Fly-*

*ing Serv. v. Tisdale*, 288 S.C. 62, 64, 339 S.E.2d 525, 527 (Ct.App.1986); *see also Troester*, 328 N.W.2d at 313 (generally, discharge or removal of personal representative of estate does not abate pending action).

The County's challenge is not one of lack of capacity to sue. The County is not asserting that Iowa Coal had a legal disability depriving it of the right to come into court. Iowa Coal is a legal entity and ostensibly had rights under the leases and amendments as an assignee, rights it claims were allegedly affected by the County's actions.

■■■ A cause of action, on the other hand, is defined by our court as

the act on the part of the defendant which gives the plaintiff his "cause of complaint." That is, there must be [a] legal right in [the] plaintiff, a corresponding duty on the part of the defendant and an attendant breach of that duty with resultant harm to plaintiff....

*Giltner v. Stark*, 252 N.W.2d 743, 745 (Iowa 1977) (citations omitted). Of the three concepts—subject matter jurisdiction, capacity to sue, and cause of action—the concept concerning cause of action is the only one that could conceivably fit the facts here.

The County is really arguing that Iowa Coal had no cause of action. The County's argument is that Iowa Coal had no right to mine and landfill under the leases when damages arose and these proceedings were instituted. The right to mine and landfill necessarily forms the basis for any suit Iowa Coal may have had against the County.

■■■ We see several problems with the County's argument, and we reject it. The County was not a party to the leases and the subsequent amendments. Because the County was not a party, it lacked standing to challenge noncompliance with any of the terms of the leases and amendments. *See* 49 Am.Jur.2d *Landlord and Tenant* § 80, at 108 (1995) (nonparty lacks standing to challenge noncompliance with a lawful lease); *United States v. Village of New Hempstead*, 832 F.Supp. 76, 80–81 (S.D.N.Y.1993) (municipality lacked standing under New York law to challenge lease of surplus federal property under McKinney Homeless Assistance Act

based on lessee's lack of authority under its corporate charter to own or lease property to provide housing; municipality also lacked standing to challenge lessee's alleged breach of lease on ground that families occupying property were not truly homeless); *Pellegrini v. Rockland Community Action Council, Inc.*, 190 A.D.2d 881, 593 N.Y.S.2d 131, 133 (1993) (because town supervisor was not party to lease, he lacked standing to seek injunction preventing nonprofit corporation from housing homeless mothers in facility leased from federal government).

.In addition, there was no record evidence that the landlords considered the leases terminated simply because Iowa Coal was not mining coal on either site. In fact, when Iowa Coal was making preparation for its landfilling operation between 1984 and 1987, it made advance royalty and leasehold payments. The County produced no evidence that at the time of trial the lessors had regained or sought to regain possession of the leased premises. As far as the record is concerned, Iowa Coal was still in possession of Star 6 and Star 14 and could mine coal and do whatever else the lease and amendments permitted.

B. *Were the constitutional claims regarding Star 6 ripe for adjudication?* As mentioned, in *Iowa Coal I* we reversed and remanded for dismissal Iowa Coal's takings claim regarding Star 6 because the claim was not ripe for adjudication. In reaching that conclusion, we reasoned that

Iowa Coal held a valid state permit to accept certain wastes at Star 6, and was using the mine as a landfill on a limited basis before the enactment of ordinance 6. The ordinance expressly allows existing nonconforming uses to continue. The record reveals, however, that Iowa Coal never sought to take advantage of this section of the ordinance.

*Iowa Coal I*, 494 N.W.2d at 671–72.

Following our decision in *Iowa Coal I*, Iowa Coal took no action to establish Star 6's nonconforming use for landfilling purposes. Instead, it brought this action. The petition alleged that under the terms of the ordinances Star 6 was and is a "legal noncon-

forming use for landfilling purposes." The petition also alleged that our decision in *Iowa Coal I* "did not reject the constitutional takings claim on Star 6 but decided, without explanation or reference to any provision of the ordinances, that the claim was 'premature.'"

In the event the district court held against Iowa Coal on the nonconforming use issue, the petition in the present action sought alternative relief. The court was asked to "make an adjudication as to the reasons, if any, under the ordinances or otherwise, the constitutional takings claim was or is premature, [and] direct the actions, if any, necessary to make the constitutional claims ripe for judicial determination."

One of the County's affirmative defenses alleged the district court lacked authority to hear the case because Iowa Coal failed to exhaust its administrative remedies under ordinances 6 and 7. The County alleged the ordinances (1) required Iowa Coal to apply for and obtain a zoning certificate to establish landfilling as a nonconforming use at Star 6 and (2) provided a review process through the board of adjustment. Because Iowa Coal failed to follow this procedure, the County contends, the district court lacked authority to hear the case.

The district court concluded that the County had raised the ripeness issue through this defense. The court noted the distinction between ripeness and exhaustion of administrative remedies. The court disposed of the exhaustion issue by concluding (1) the ordinances provided no remedy and (2) even if a remedy existed, the remedy under the circumstances would have been fruitless and inadequate. The court also concluded Iowa Coal's takings claim regarding Star 6 was ripe for adjudication because of the County's adoption of ordinance 7 and its interference with Iowa Coal's use of Star 6 for landfilling purposes.

The County asserts that following our decision in *Iowa Coal I,* Iowa Coal continued to do nothing to take advantage of the nonconforming use provisions of the ordinances. As mentioned, we said in *Iowa Coal I* that the takings claim as to Star 6 was not ripe for adjudication because Iowa Coal never sought to take advantage of the nonconforming use provisions of ordinance 6. In short, we dismissed the suit as not being ripe because the County had not made a final decision as to the property's use.

The County points out that following our decision in *Iowa Coal I,* Iowa Coal neither attempted to use Star 6 for landfilling purposes nor requested a status determination regarding the nonconforming use. Thus, the County concludes, the County still had not made a final decision as to the property's use. For this reason, the County urges that the district court incorrectly ruled the takings claim as to Star 6 was ripe for adjudication.

1. *Applicable law.* The contentions of the parties bring into focus several concepts. They include nonconforming use, takings claim, inverse condemnation, exhaustion of administrative remedies, and ripeness.

■ (a) *Nonconforming use.* A nonconforming use is

a use which not only does not conform to the general regulation or restriction governing a zoned area but which lawfully existed at the time that the regulation or restriction went into effect and has continued to exist without legal abandonment since that time.

*State v. Bates,* 305 N.W.2d 426, 427 (Iowa 1981) (quoting 8A E. McQuillin, *The Law of Municipal Corporations* § 25.185, at 22 (3d ed.1976)).

■ (b) *Takings claim.* The Fifth Amendment to the Federal Constitution provides that a person may not be "deprived of property, without due process of law; nor shall private property be taken for public use without just compensation." The Fourteenth Amendment to the Federal Constitution makes binding on the states the "just compensation" clause of the Fifth Amendment. *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358, 364 (1980). An Iowa constitutional provision similarly provides that "[p]rivate property shall not be taken for public use without just compensation first being made...." Iowa Const. art. I, § 18.

"Taking," for the purposes of the federal and Iowa constitutional right of just compensation,

> does not necessarily mean the appropriation of the fee. It may be anything which substantially deprives one of the use and the enjoyment of his property or a portion thereof.

*Phelps v. Board of Supervisors,* 211 N.W.2d 274, 276 (Iowa 1973). Thus, while the government may regulate property to a certain extent, "if the regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322, 326 (1922).

In *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1014, 112 S.Ct. 2886, 2892, 120 L.Ed.2d 798, 812 (1992), the Supreme Court explained the rationale for the "takings" concept:

> Prior to Justice Holmes' exposition in [*Mahon* ], it was generally thought that the Takings Clause reached only a "direct appropriation" of property or the functional equivalent of a "practical ouster of [the owner's] possession." Justice Holmes recognized in *Mahon,* however, that if the protection against physical appropriations of private property was to be meaningfully enforced, the government's power to redefine the range of interests included in the ownership of property was necessarily constrained by constitutional limits. If, instead, the uses of private property were subject to unbridled, uncompensated qualifications under the police power, "the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed]." These considerations gave birth [in *Mahon* ] to the oft-cited maxim that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."

(Citations omitted.)

In *Lucas,* the Supreme Court decided "how far is too far." The Court recognized the principle that land-use regulation does not effect a taking requiring compensation if it substantially advances a legitimate state interest. *Lucas,* 505 U.S. at 1023–24, 112 S.Ct. at 2897, 120 L.Ed.2d at 818. The

Court, however, recognized two exceptions. When the regulation (1) involves a permanent physical invasion of property or (2) denies the owner all economically beneficial or productive use of the land, the State must pay just compensation. *Id.* at 1028–29, 112 S.Ct. at 2900, 120 L.Ed.2d at 821.

Under limited circumstances, the State may resist payment of compensation even though the regulation denies the owner all economically beneficial or productive use of the land. The limited circumstances include those instances in which the State can show that the owner's "bundle of rights" never included the right to use the land in the way the regulation forbids. *Id.* at 1027, 112 S.Ct. at 2899, 120 L.Ed.2d at 820.

(c) *Inverse condemnation.* The term "inverse condemnation" is a generic description of the manner in which a landowner recovers just compensation for a taking of the owner's property when condemnation proceedings have not been instituted. *Scott v. City of Sioux City,* 432 N.W.2d 144, 145 n. 1 (Iowa 1988).

(d) *Exhaustion of administrative remedies.* The exhaustion of administrative remedies requirement is a rule of almost universal application. According to the rule, before a party can call upon the court to act, the party must have exhausted any remedy available before an administrative agency. *Matters v. City of Ames,* 219 N.W.2d 718, 719 (Iowa 1974); *see also City of Iowa City v. Hagen Elecs., Inc.,* 545 N.W.2d 530, 533–34 (Iowa 1996). If administrative remedies are not exhausted, the court lacks jurisdiction to hear the case. *Aschan v. State,* 446 N.W.2d 791, 792 (Iowa 1989).

When the remedy is inadequate or its pursuit would be futile, exhaustion is not required. *Matters,* 219 N.W.2d at 719. This exception "is concerned with the adequacy of the remedy, not a perceived predisposition of the decision maker." *North River Ins. Co. v. Iowa Div. of Ins.,* 501 N.W.2d 542, 546 (Iowa 1993). Thus, "a claim of bias is insufficient to avoid the exhaustion requirement." *Id.; see also Hagen,* 545 N.W.2d at 535.

(e) *Ripeness doctrine.* If a claim is not ripe for adjudication, a court is without jurisdiction to hear the claim and must dismiss it. *Triple G. Landfills, Inc. v. Board of Comm'rs,* 977 F.2d 287, 288–89 (7th Cir. 1992); *Iowa Coal I,* 494 N.W.2d at 672; *Bakken v. City of Council Bluffs,* 470 N.W.2d 34, 37 (Iowa 1991). The basic rationale for the ripeness doctrine

> is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681, 691 (1967). In *Abbott,* the Court, in keeping with this rationale, pointedly noted that "injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." *Id.* at 148, 87 S.Ct. at 1516, 18 L.Ed.2d at 691.

Another court viewed the ripeness doctrine this way:

> The ripeness doctrine deals with the time, if any, at which a party may seek pre-enforcement review of a statute or regulation. It seeks to avoid the premature adjudication of cases when the issues posed are not fully formed, or when the nature and extent of the statute's application are not certain.

*Triple G. Landfills,* 977 F.2d at 288–89.

When considering a ripeness issue, a court must generally address two factors. First, are the relevant issues sufficiently focused so as to permit judicial resolution without further factual development? Second, would the parties suffer any hardship by the postponement of judicial action? *Triple G. Landfills,* 977 F.2d at 289; *see Abbott,* 387 U.S. at 149, 87 S.Ct. at 1515, 18 L.Ed.2d at 691.

In a regulatory takings claim premised on an alleged civil rights violation under 42 U.S.C. § 1983, the Supreme Court has placed heavy emphasis on the first factor: Are the relevant issues sufficiently focused so as to permit judicial resolution without further factual development? As the Supreme Court noted in *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 191, 105 S.Ct. 3108, 3118–19, 87 L.Ed.2d 126, 141 (1985), the reason for this emphasis is plain:

> [R]espondent has not yet obtained a final decision regarding how it will be allowed to develop its property. Our reluctance to examine taking claims until such a final decision has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause. Although "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty," this Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.

(Citations omitted.) In short, "takings cases are fact-intensive and require a careful examination of the challenged decision's economic impact and 'the extent to which it interferes with reasonable investment-backed expectations.'" *Triple G Landfills,* 977 F.2d at 289 (citing *Williamson County,* 473 U.S. at 190–91, 105 S.Ct. at 3118–19, 87 L.Ed.2d at 141).

The Court in *Williamson County* imposed two conditions, both of which must be met before a takings claim is "ripe" under § 1983. First, there must be finality in the underlying proceedings. Second, the landowner must exhaust state remedies available to vindicate the owner's rights. *Williamson County,* 473 U.S. at 185–95, 105 S.Ct. at 3115–121, 87 L.Ed.2d at 138–44; *see Bakken,* 470 N.W.2d at 36. Both conditions are consistent with the first factor underlying the ripeness doctrine: Are the relevant issues sufficiently focused so as to permit judicial

resolution without further factual development?

■ The Court explained the difference between finality and exhaustion as they relate to a takings claim:

The question whether administrative remedies must be exhausted is conceptually distinct ... from the question whether an administrative action must be final before it is judicially reviewable. While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

*Williamson County,* 473 U.S. at 192–93, 105 S.Ct. at 3119–120, 87 L.Ed.2d at 142–43 (citation omitted).

■ The Court explained the importance of finality in the underlying proceedings:

[R]esort to the procedure for obtaining variances [administrative remedy] would result in a conclusive determination by the Commission whether it would allow respondent to develop the subdivision in the manner respondent proposed. The Commission's refusal to approve the preliminary plat does not determine that issue; it prevents respondent from developing its subdivision without obtaining the necessary variances, but leaves open the possibility that respondent may develop the subdivision according to its plat after obtaining the variances. In short, the Commission's denial of approval does not conclusively determine whether respondent will be denied all reasonable beneficial use of its property, and therefore is not a *final, reviewable decision.*

*Id.* at 193–94, 105 S.Ct. at 3120–21, 87 L.Ed.2d at 143 (emphasis added). This language makes clear that the landowner must establish finality—a final, reviewable decision—in the underlying proceedings. This final, reviewable decision allows a reviewing court to determine how much the owner's use of the property has been impaired, and therefore "taken" by the governmental action.

In *Williamson County,* the Court held that the landowner had failed to show finality because it had not applied to the Board of Zoning Appeals for variances from the ordinance and obtained a final, reviewable decision as to the use of its property. The Court also held that the landowner had failed to show the necessary exhaustion of state remedies because it had not used the inverse condemnation procedures available under Tennessee law. *Williamson County,* 473 U.S. at 194–95, 105 S.Ct. at 3120–21, 87 L.Ed.2d at 144 ("If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking.") (quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1013, 1018 n. 21, 104 S.Ct. 2862, 2878, 2880 n. 21, 81 L.Ed.2d 815, 839, 842 n. 21 (1984)).

■ Exhaustion in a takings case is necessary because the Fifth Amendment prohibits taking without "just compensation," and no constitutional violation occurs until state proceedings have denied just compensation. A landowner who seeks compensation under a takings theory must establish that state remedies are inadequate. *Austin v. City & County of Honolulu,* 840 F.2d 678, 680 (9th Cir.1988); *see Bakken,* 470 N.W.2d at 37. And, as mentioned, unless a claim is ripe for adjudication, a court has no jurisdiction to hear it. *Austin,* 840 F.2d at 680; *see Iowa Coal I,* 494 N.W.2d at 672; *Bakken,* 470 N.W.2d at 37.

■ In short, *Williamson County* makes finality and exhaustion of state remedies conditions precedent to ripeness. Exhaustion of *state* remedies is a condition precedent because in *Williamson County* the regulatory takings claim was premised on an alleged civil rights violation under 42 U.S.C. § 1983. State remedies for such an action include a state inverse condemnation claim. As also mentioned, such exhaustion is necessary to determine whether a taking has occurred.

■ In a state inverse condemnation proceeding like the present one, it is inaccurate to talk in terms of exhaustion of state remedies because the proceeding itself is a state remedy. Our only concern in such a proceeding is whether there has been finality, the other condition precedent to ripeness. Finality equates to exhaustion of administrative remedies under the challenged regulatory ordinance so that a final, reviewable decision must be made regarding the use of the property. A court can make no determination of the takings claim until the regulatory authority under the ordinance makes that final decision.

With these principles in mind, we turn to the merits on this issue.

2. *The merits.* In Count I of its petition, Iowa Coal alleged that under ordinances 6 and 7 there is a nonconforming use for landfilling at Star 6. Iowa Coal further alleged that if Star 6 does not have such status under these ordinances, then the ordinances result in a taking of its property without just compensation under the Federal and Iowa Constitutions. As mentioned, Iowa Coal asked for alternative relief if the court should find that there is no nonconforming use for landfilling at Star 6. The alternative relief requested included having the court (1) determine why the constitutional takings claim was premature, (2) direct the actions necessary to make the claim ripe for judicial determination, and (3) award just compensation after the remedies, if any, ordered by the court are pursued or resolved.

Clearly, Iowa Coal has alleged an inverse condemnation claim. Further, the pleadings implicitly and correctly acknowledge that if there is at Star 6 a nonconforming use for landfilling purposes, then Iowa Coal has no claim for just compensation under either the Federal or Iowa Constitutions. Moreover, the alternative relief requested implicitly recognizes that Iowa Coal's claim may be premature because Iowa Coal failed to exhaust its administrative remedies, if any, under the ordinances.

■ We now turn to ordinances 6 and 7 to determine if they provided an adequate remedy for Iowa Coal to establish Star 6's nonconforming use status for landfilling purposes. Ordinances 6 and 7 provide for nonconforming uses and are identical in their definition of such uses:

**Nonconforming use.** Any lawful use, whether of a building or other structure or *a tract of land,* which does not conform to the applicable use regulation for the district in which it is located, either on the effective day of this ordinance or as a result of a subsequent amendment thereto.

(Emphasis added.)

As to uses of land, the ordinances permit nonconforming uses to continue "so long as [they] remain otherwise lawful." The ordinances also subject nonconforming uses to several conditions. One condition prohibits enlargement of the use. Another condition prohibits moving the use "in whole or in part to any portion" of the land not occupied by the use on the effective date of the ordinances.

A final condition requires that

[i]f any such nonconforming use of land ceases for any reason for a period of more than six (6) months, any subsequent use of such land shall conform to the district regulations for the district in which such land is located.

In contrast to the provisions dealing with conditional uses and variances, the provisions dealing specifically with nonconforming uses clearly do not give the County authority to deny the use if the use was in existence at the time of the ordinances. A landowner can continue to use the property as the owner had in the past unless the use is successfully challenged on the ground that the use is not a nonconforming use.

With one exception the nonconforming use stands on its own. The exception relates to zoning certificates and is found in both ordinances 6 and 7:

A. No land shall be occupied or used ... in whole or in part for any purpose whatsoever, until a certificate is issued by the Zoning Administrator stating that ... the use compl[ies] with the provisions of this ordinance....

....

C. Nothing in this part shall prevent the continuance of a nonconforming use as hereinbefore authorized, unless a discontinuance is necessary for the safety of life or property.

D. Written application on approved forms shall be filed with the Zoning Administrator and shall be accompanied by plans in duplicate ... showing ... the location of the present use and the proposed use to be made of the lot, and such other information with regard to the lot and neighboring lots as may be necessary to determine and provide for the enforcement of this ordinance.

Paragraph "A" makes clear that before land can be used for any purpose, the zoning administrator must issue a zoning certificate stating that the use complies with the ordinance. Nonconforming uses are therefore subject to this provision.

Paragraph "C" also makes clear that the zoning certificate requirement cannot prevent the continuance of a nonconforming use that meets the requirement of the ordinances. As mentioned, those requirements include the following. First, the nonconforming use was in existence and lawful on the effective date of the ordinance. Second, the nonconforming use remains otherwise lawful. Third, the nonconforming use has not been moved to another part of the land that was not occupied by the use on the effective date of the ordinance. Last, the nonconforming use has not for any reason ceased for more than six months. If all of these requirements are met, the zoning administrator must issue the certificate.

Paragraph "D" requires the landowner to file a written application with the zoning administrator for the zoning certificate. The written application must identify and indicate, the location of the use.

As applied to nonconforming uses, these provisions permit the zoning administrator— in advance of any enforcement action—to determine (1) whether a landowner is claiming a nonconforming use, (2) where that use is located, (3) how extensive the use is, (4) whether it is a lawful use, and (5) whether the use has ceased to exist.

If for any reason the zoning administrator refuses to grant the certificate, the landowner's next step is to appeal to the board of adjustment under the provisions in the ordinances dealing with that body. Ordinances 6 and 7, again in identical language, establish a board of adjustment, consisting of five members, and establish a procedure for appeal.

The appeal procedure provides in relevant part that "[t]he board of adjustment shall hear and decide appeals from and review any order, requirement, decision or determination made by the zoning administrator in the enforcement of this ordinance." The ordinances give the board of adjustment the power "to hear and decide appeals where it is alleged that there is error of law in any order, requirement, decision or determination made by the zoning administrator in the enforcement of this ordinance." The ordinances provide for a hearing before the board of adjustment and authorize the board to "reverse or confirm, in whole or in part," or "modify the order, requirement, decision or determination as in its opinion ought to be made, and to that end shall have all the powers of the office from whom the appeal is taken." The same provisions then allow any persons "aggrieved by any decision of the board of adjustment under the provisions of this ordinance ... [to] seek relief through the courts as provided by statute."

Iowa Code chapter 335 contains the statutory provisions on county zoning. Those provisions authorize a county to establish an administrative officer who is empowered to enforce the county's ordinances. These provisions also authorize a county to establish a board of adjustment having all of the authority and power referred to above in ordinances 6 and 7.

Iowa Code section 335.18 allows a party who is aggrieved by a board of adjustment decision to appeal that decision to the district court. The district court's review is via certiorari. Iowa Code § 335.19. The issues in district court are tried de novo, and the court "may reverse or affirm, wholly or partly, or may modify the decision brought up for review." Iowa Code § 335.21.

What we have just described is the administrative remedy that was available to Iowa

Coal to establish whether in fact it had a nonconforming use to landfill at Star 6. Had Iowa Coal applied for the zoning certificate, the zoning administrator would have had to decide whether such use complied with the ordinances. An affirmative decision would have established the use complied with the ordinances. Iowa Coal could then have legally continued landfilling at Star 6.

A negative decision would have permitted Iowa Coal to appeal the decision to the board of adjustment. A favorable decision there would have established the use. A negative decision would have permitted review of the board's decision in the district court which then could have overturned the board's decision and established the use.

A negative decision for either the County or Iowa Coal in the district court would have permitted an appeal by either party to our court. We, in turn, could then have overturned a district court decision adverse to Iowa Coal and established the use. A negative decision by our court on the use would have satisfied the exhaustion requirement and permitted Iowa Coal to bring its inverse condemnation claim.

As the record now stands, the County has never had the opportunity to make a final, reviewable decision whether to allow the use. Iowa Coal's claim for regulatory taking (more precisely inverse condemnation) is not ripe for adjudication until the remedy we have outlined is first pursued. Accordingly, we reverse and remand this claim for dismissal because the district court lacked jurisdiction, that is, authority to hear the case. See Aschan, 446 N.W.2d at 792.

█ Our decision regarding exhaustion of administrative remedies obviates our need to resolve any issue on the merits regarding Star 6's and Star 14's nonconforming use status under either ordinance 6 or 7. Before Iowa Coal can seek a court determination regarding such status, it must exhaust the zoning certificate remedy under the ordinances. Accordingly, we likewise reverse and remand the nonconforming use claims regarding Star 6 and Star 14 for dismissal because the district court also lacked jurisdiction to hear them.

Contrary to the district court's findings, the County's interference did not make the zoning certificate remedy in the ordinances fruitless and inadequate. As mentioned, our cases hold that the fruitless and inadequate exception to the exhaustion requirement is only concerned with the adequacy of the remedy. The exception is not concerned with a preconceived disposition or even bias on the part of the decision maker. Thus, any bias or preconceived disposition the County may have had against Iowa Coal did not relieve Iowa Coal of the requirement to pursue the zoning certificate remedy.

C. *Is there a cause of action against a municipality for tortious interference with a prospective business relationship?* In its findings of fact, the district court found that the County had interfered with a prospective business contractual relationship between Iowa Coal and Metropolitan Waste Control Commission (Metro Waste), a Minnesota municipal utility. In a separate judgment entry filed the same day, the court ordered the County to pay "compensatory damages to Iowa Coal in the amount of $850,000, based on [Iowa Coal's] claim of tortious interference with Iowa Coal's ... business expectancies."

The County argues that the district court erred in awarding damages to Iowa Coal for the County's alleged tortious interference with a prospective contractual relationship. According to the County, Iowa Coal's claim for tortious interference is "not a recognizable tort against government." Essentially, the County contends that the only viable claim Iowa Coal could pursue against the County as to the Metro Waste matter was one under 42 U.S.C. § 1983. This § 1983 claim, the County argues, was time barred under the applicable statute of limitations, which the County argues is the two-year statute for personal injury actions. See Iowa Code § 614.1(2). The County preserved these issues for our review in its rule 179(b) motion.

We reject the County's argument on these issues for several reasons. First, this court has never held that a tortious interference with a prospective contractual relationship claim would not be allowed against a govern-

mental entity. And the County cites no authority for this argument.

Although the issue has not been before us as precisely as the County has raised it, we have considered two cases in which the tort was alleged against a governmental entity. *Robert's River Rides, Inc. v. Steamboat Dev. Corp.*, 520 N.W.2d 294 (Iowa 1994) (city intentionally contacted Iowa Department of Natural Resources seeking termination of plaintiff's riverbed lease); *Water Dev. Co. v. Board of Water Works*, 488 N.W.2d 158 (Iowa 1992) (private water company sued public works that expanded into its area of operation).

Moreover, several provisions of Iowa Code chapter 670 (Tort Liability Governmental Subdivision) support our conclusion that an interference with a prospective contractual relationship claim is a recognizable tort against a governmental subdivision like the County. Iowa Code section 670.2 subjects "every municipality ... to liability for its *torts*. ..." (Emphasis added.) Iowa Code section 670.1 defines a municipality to include a county. We have held that an abrogation of governmental immunity under chapter 670, and more specifically 670.2, means that the same principles of tort liability apply to municipalities except as limited in chapter 670. *Hildenbrand v. Cox*, 369 N.W.2d 411, 416 (Iowa 1985). In *Symmonds v. Chicago, Milwaukee, St. Paul & Pacific Railroad*, 242 N.W.2d 262, 264 (Iowa 1976), we made clear that chapter 670 eliminated any common law immunity in tort previously accorded governmental subdivisions, except for those torts specifically excluded.

 We have recognized, as a tort, interference with prospective contractual relationships. *See Farmers Coop. Elevator, Inc. v. State Bank*, 236 N.W.2d 674, 679 (Iowa 1975); *Clark v. Figge*, 181 N.W.2d 211, 214 (Iowa 1970). It is therefore included within the meaning of "tort" under section 670.2 ("every municipality is subject to liability for its torts ..."), unless it is specifically excluded by statute. Iowa Code section 670.4 enumerates the claims excluded, and interference with a prospective contractual relationship is not included. We therefore hold that tortious interference with a prospective contractual re-

lationship is a recognizable tort against a governmental subdivision like the County.

 Second, as Iowa Coal contends, a § 1983 claim applies only to a deprivation of a federal right. Under the County's argument, the deprivation of the federal right equates to a denial of due process by arbitrary enactment or enforcement of a zoning ordinance. *See Bakken*, 470 N.W.2d at 38. As Iowa Coal argues, its claim is for tortious interference—a state tort. The tortious interference claim is not premised on a denial of a federal right. The alleged interference with the prospective contractual arrangement with Metro Waste involved the County's direct contact with Metro Waste and the IDNR to prevent performance under Iowa Coal's prospective contract with Metro Waste. Adoption and application of ordinance 6 was not even involved.

 Last, because Iowa Coal's claim is truly a tortious interference claim, the applicable period of limitations is five years. *See* Iowa Code § 614.1(4); *Clark*, 181 N.W.2d at 216. In 1988 Iowa Coal actively marketed Star 6, more specifically 10.3 acres of Star 6, for landfilling of utility and industrial ash waste generated in and out of Iowa. These efforts resulted in negotiations with Metro Waste for the deposit of 125,000 tons of incinerated sewage sludge ash. Metro Waste adopted a resolution on December 20, 1988, to finalize an agreement with Iowa Coal to transport its ash to the Star 6 site. Allegedly the County's actions after December 20, 1988, caused the agreement to fall through. Iowa Coal filed the present action on May 7, 1993, well within five years of December 20, 1988. We therefore conclude Iowa Coal filed its tortious interference claim in a timely manner.

 D. *Should the district court have sustained the County's motion for directed verdict regarding Iowa Coal's tortious interference claim?* As mentioned, this claim relates to the alleged prospective contractual relationship with Metro Waste. The County contends the evidence failed to generate a jury question on this alleged prospective contractual relationship. For that reason, the County argues the district court

should have sustained its motion for directed verdict on this claim and urges us to reverse for this alleged error. Because this action was tried to the court without a jury, the County should have designated this motion as a motion to dismiss rather than as a motion for directed verdict. *B & B Asphalt Co. v. T.S. McShane Co.*, 242 N.W.2d 279, 281 (Iowa 1976). The misnomer is not material, however, because a motion to dismiss during trial is equivalent to a motion for directed verdict. *Id.*

> When reviewing a trial court's ruling on a motion for directed verdict, we review the evidence in the same light as the district court in order to determine whether or not a jury question was generated. When considering a motion for a directed verdict, the court must view the evidence in the light most favorable to the party against whom the motion is made. Even if facts are not in dispute, if reasonable minds might draw different inferences from them, a jury question is engendered.

*Toney v. Casey's Gen. Stores, Inc.*, 460 N.W.2d 849, 852 (Iowa 1990) (citation omitted).

██ The elements of tortious interference with a prospective contractual relationship are:

1. A prospective contractual or business relationship;

2. the defendant knew of the prospective relationship;

3. the defendant intentionally and improperly interfered with the relationship;

4. the defendant's interference caused the relationship to fail to materialize; and

5. the amount of resulting damages.

*Nesler v. Fisher & Co.*, 452 N.W.2d 191, 198–99 (Iowa 1990). Element number three requires proof that the defendant intended to financially injure or destroy the plaintiff. *Burke v. Hawkeye Nat'l Life Ins. Co.*, 474 N.W.2d 110, 115 (Iowa 1991). As the following excerpt from the County's motion for directed verdict shows, the County focused solely on this element.

C. The claim of tortious interference with future business prospects or contracts does not lie against a municipality for the adoption of a regulatory law or ordinance that places restrictions upon the use of property.

D. The evidence fails to establish or generate a fact question that this defendant or any of its elected officials abused [its governmental power by actions] directed to the plaintiffs and each of them with the intent to injure or damage.

We accordingly limit our discussion to the question whether the evidence generated a fact question on the County's intent to financially injure or destroy Iowa Coal. More specifically, in interfering with Iowa Coal's prospective contractual relationship with Metro Waste, was the County's predominant motive to financially injure or destroy Iowa Coal?

To determine whether there was sufficient evidence to generate a fact question on the issue of motive, we look to the County's actions before, during, and after the alleged interference. In 1987 Iowa Coal began marketing Star 6 and 14 for landfilling purposes. During August of that year, Randy Luwe—Iowa Coal's vice president and geologist—and Huyser attended a six-county meeting in an effort to secure these six counties as landfilling customers. The County provided school buses for landfill protesters to be transported to that meeting. Several County board members and other county officials attended the meeting. At the meeting, the Monroe County attorney publicly stated the County's opposition to the landfill and criticized the past safety record of Iowa Coal.

During this same time frame, county board members pressed the County engineer to give an opinion that Iowa Coal's landfilling project would damage county roads. The engineer testified that he refused to do so because, according to him, such a statement would be false.

A county board member called the Polk County zoning administrator, asking his advice on what kind of ordinance could be used to stop a landfill. The administrator advised the board member to use a health and safety ordinance. Shortly thereafter, in September 1987, the County passed ordinance 4. At this

time there were two existing landfills in the County other than the Iowa Coal Star sites. Ordinance 4 exempted existing landfills. Iowa Coal's landfilling project was the only new landfill being proposed at that time.

During the following six months, the County hired an environmental consultant to raise issues with the IDNR about Iowa Coal's proposed landfilling activities at the two sites. This was during the time Iowa Coal was actively seeking a landfill permit from the IDNR for Star 14.

The County also embarked on a project to adopt a county-wide zoning ordinance. One board member publicly stated that the purpose of the ordinance was to stop the landfill that Iowa Coal was proposing.

The County hired a consultant to draft a county-wide zoning ordinance. This draft was submitted to a newly-formed county zoning commission chaired by a local landfilling operator. The original draft allowed a combination of uses in a zoning district, including a combination of coal mining and landfilling uses. The draft was changed to prevent this combined use.

While the County was developing the zoning ordinance, it successfully delayed issuance of the Star 14 landfilling permit. The County did so through correspondence with the IDNR and requests for information from that agency on issues that had already been resolved. In addition, the County insisted on a public hearing, a hearing that the IDNR rules did not prescribe.

In February 1988 the County rescinded its previously granted permission to allow Iowa Coal to mine through a County road. The previously granted permission was based on a long standing historical practice.

The County adopted the new zoning ordinance—ordinance 6—on May 12, 1988, one day before Iowa Coal obtained the landfilling permit for Star 14. Shortly before the ordinance's adoption, Huyser made public statements that if the county adopted the ordinance, he would have to close down his operations. These statements were reported in the local newspaper.

One month after ordinance 6's adoption, Iowa Coal filed a rezoning application to rezone its property. Before the hearing on the rezoning request, the County zoning commissioner, during a visit to the site, stated to a fellow commission member that it would be a shame to see the ground at the sites torn up.

During the public hearing on the zoning request in September 1988, a county official likened Iowa Coal's landfilling project to "Three Mile Island." The same official had, during all this time, voiced opposition in articles she published in the local newspaper. She penned these articles in her capacity as a county official.

Following the County's decision to reject Iowa Coal's zoning request, the County gave Huyser a list of zoning "options." The County zoning commission had previously rejected all these options.

Iowa Coal then began marketing the Star 6 site to landfill customers both inside and outside Iowa. In August 1988, Iowa Coal approached Lucas County about moving Iowa Coal's landfill operation there. The County provided Lucas County with information on how to stop a landfill. Shortly thereafter discussions between Iowa Coal and Lucas County stopped.

Iowa Coal entered negotiations with several Minnesota utilities, namely Metro Waste and Northern State's Power. Metro Waste officials visited the two sites and reviewed Iowa Coal's design plans. As mentioned, on December 20, 1988, Metro Waste adopted a resolution to negotiate a contract with Iowa Coal and to arrange for transportation of its incinerated sewage sludge ash to Star 6. The proposed contract called for a deposit of 125,000 tons of such ash at the Star 6 site. The proposed contract would have resulted in an $850,000 profit to Iowa Coal.

Iowa Coal proceeded to seek from the IDNR a modification of its Star 6 permit to allow Iowa Coal to receive the ash waste from Metro Waste. At first, the IDNR was positive toward granting the modification and indicated to Metro Waste officials there would be no problem.

At this point a County official, acting under the County's direction, lobbied the IDNR

not to issue the modification to the Star 6 permit. The IDNR's attitude changed considerably. When Metro Waste officials visited the IDNR, the agency told the Metro Waste representatives that Iowa Coal would need a major modification of its existing Star 6 permit to receive the Metro Waste ash.

The County wrote letters opposing the proposed Metro Waste contract, warned Metro Waste to take its business elsewhere, and informed Metro Waste that its zoning ordinance prohibited the landfilling project. All of this opposition culminated in a petition received by Metro Waste from Monroe County residents opposing the proposed contract with Iowa Coal.

The opposition directed to Metro Waste and to the IDNR led Metro Waste to abandon the proposed contract and to take its business elsewhere. Two landfill experts testified about the effect of the County's opposition to the Metro Waste proposed contract. They agreed that—given the emotionally charged nature of the landfilling industry—the County's actions could and did have a chilling effect on potential Iowa Coal customers. They also agreed that it is difficult, if not impossible, to secure landfilling customers with continued local governmental interference.

As an expert aptly described, the County's actions were "like pouring ice water in somebody's shorts. It just kills the deal. It's a deal killer." These experts explained that such interference makes it impossible for a waste system generator to consummate any agreement with a landfill operator. The interference results in too much uncertainty on whether the landfill will be able to take the waste over a period of time under the agreed upon price and volume conditions.

In June 1990, Iowa Coal contracted with an investment group to purchase Iowa Coal's permits and landfill sites. Because of the ongoing litigation, Iowa Coal was out of cash, had lost more than 100 employees, and was facing ongoing expenses for permit renewal and for reclamation. The investment group eventually abandoned the contract because the group could never gain any cooperation or clearance from the County.

Viewing all of this evidence in the light most favorable to Iowa Coal, we think the district court could reasonably infer that the County was bent on stopping *all* landfilling operations on the two sites, even if that meant driving Iowa Coal out of business. The County's interference with the proposed Metro Waste contract was just one part of this overall scheme. We conclude there was sufficient evidence to generate a jury question on whether the County's predominant motive regarding the Metro Waste proposed contract was to financially injure or destroy Iowa Coal.

E. *Are the tortious interference claim and the nonconforming use claims barred by claim preclusion?* The County contends that res judicata in the sense of claim preclusion bars Iowa Coal's tortious interference claim and its claims of nonconforming use for the Star 6 and Star 14 sites. In support of its contention, the County argues that (1) the acts complained of in both cases are the same, (2) the recovery demanded in both actions are the same, and (3) the evidence in both actions are the same. For these reasons, the County asserts, Iowa Coal could have and should have asserted the tortious interference and nonconforming use claims in the first action. Because Iowa Coal failed to do so, the County concludes, these claims are barred.

1. *Applicable law.* The doctrine of res judicata provides that

> a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies, and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action.

Black's Law Dictionary 1305 (6th ed.1990); *accord Phoenix Fin. Corp. v. Iowa–Wisconsin Bridge Co.,* 237 Iowa 165, 175, 20 N.W.2d 457, 461–62 (1945). To establish the bar under the doctrine of res judicata, the party asserting the bar must establish that the former case involved (1) the same parties or parties in privity, (2) the same cause of action and (3) the same issues. *Bloom v. Steeve,* 165 N.W.2d 825, 827–28 (Iowa 1969).

Res judicata in the sense of claim preclusion means that further litigation on the claim is barred. Res judicata in the sense of issue preclusion means that further litigation on a specific issue is barred. *Israel v. Farmers Mut. Ins. Ass'n*, 339 N.W.2d 143, 146 (Iowa 1983). The County is asserting res judicata in the sense of claim preclusion.

Claim preclusion is based on the principle that a party may not split or try his claim piecemeal, but must put in issue and try his entire claim or put forth his entire defense in the case on trial. An adjudication in a former suit between the same parties on the same claim is final as to all matters which could have been presented to the court for determination. A party must litigate all matters growing out of his claim at one time and not in separate actions.

*B & B Asphalt Co.*, 242 N.W.2d at 286 (citations omitted). A party "is not entitled to a second day in court simply by alleging a new ground of recovery for the same wrong." *Westway Trading Corp. v. River Terminal Corp.*, 314 N.W.2d 398, 401 (Iowa 1982).

To determine whether the cause of action is the same, we examine (1) the protected right, (2) the alleged wrong, and (3) the relevant evidence. *Id.* As to the third item—the relevant evidence—

if it is doubtful whether a second action is for the same cause of action as the first, the test generally applied is to consider the identity of facts essential to their maintenance, or whether the same evidence would sustain both. If the same facts or evidence would sustain both, the two actions are considered the same within the rule that the judgment in the former is a bar to the subsequent action. If, however, the two actions rest upon different states of facts, or if different proofs would be required to sustain the two actions, a judgment in one is no bar to the maintenance of the other.

*Phoenix Fin. Corp.*, 237 Iowa at 175–76, 20 N.W.2d at 461–62.

*Williamson v. Columbia Gas & Electric Corp.*, 186 F.2d 464 (3rd Cir.1950), *cert. denied*, 341 U.S. 921, 71 S.Ct. 743, 95 L.Ed. 1355 (1951), offers further guidance in determining whether the causes of action are the same. In that case, the plaintiff brought separate actions seeking the same recovery but on different theories. In the first action, the theory was conspiracy in violation of the Sherman Act; in the second action, the theory was violation of the Clayton Act. In holding that dismissal of the second action barred the first action, the court said:

As pointed out above, the acts complained of and the demand for recovery are the same. The only thing that is different is the theory of recovery. The same witnesses and documents will be necessary in the trial in both cases. No material fact is alleged in action No. 1 that was not alleged in action No. 2, save the allegations of conspiracy. Everything that plaintiff was entitled to ask for from defendant was included in action No. 2.

*Williamson*, 186 F.2d at 470.

In *Williamson* the court explained what constitutes the same claim or cause of action for res judicata purposes:

Reference to the basic theory of tort liability substantiates the position taken here. To put it in rather elementary tort language, the basis of the plaintiff's recovery is liability-creating conduct on the part of the defendant, the invasion of a legally protected interest of the plaintiff and the necessary causal connection between defendant's acts and plaintiff's injury. The plaintiff having alleged operative facts which state a cause of action because he tells of defendant's misconduct and his own harm has had his day in court. He does not get another day after the first lawsuit is concluded by giving a different reason than he gave in the first for recovery of damages for the same invasion of his rights. The problem of his rights against the defendant based upon the alleged wrongful acts is fully before the court whether all the reasons for recovery were stated to the court or not.

*Id.* In *B & B Asphalt Co.*, 242 N.W.2d at 286–87, we recognized this explanation was in accord with our cases holding that "identity of cause of action is established when the same evidence will maintain both actions."

We applied the explanation in concluding that the plaintiff's second action was the same as its first action:

> Here the same evidence would be probative in both actions. They arise from the same transaction and depend on evidence of the same events. The parties are agreed plaintiff's first action was based on a theory of fraud. Plaintiff's petition in the second action is in three divisions. In the first division, the conduct alleged in plaintiff's first action to be fraud is alleged instead to constitute express warranties. In the second division, the same conduct is alleged to give rise to implied warranties. In the third division, the same conduct is alleged to be negligent.
>
> Claim preclusion is plainly applicable. In his second action plaintiff sought a second day in court on the same claim he made in the first action. Only the theories of recovery are different. Plaintiff could have advanced all these theories in the first action. It is barred by the defense of res judicata from seeking to do so in the second action.

*B & B Asphalt,* 242 N.W.2d at 287.

■ In determining whether res judicata in the sense of claim preclusion applies, we must be careful to distinguish between the concept of the "same" cause of action and the concept of a "related" cause of action. We have recognized: "[t]he right to join related causes of action does not bar subsequent litigation of a distinct cause of action that was not joined. The situation is the same as with a permissive counterclaim." *Westway Trading Corp.,* 314 N.W.2d at 401 (citation omitted), *accord Leuchtenmacher v. Farm Bureau Mut. Ins. Co.,* 460 N.W.2d 858, 860 (Iowa 1990); *Israel,* 339 N.W.2d at 146.

In *Westway Trading Corp.,* the plaintiff brought a declaratory judgment action seeking to uphold its lease, to define the boundaries of the leasehold, and to determine the plaintiff's right to use truck scales. The plaintiff also sought damages for denial of use of the truck scales, interference with moving a storage tank, and efforts to oust the plaintiff. In addition, the plaintiff sought injunctive relief against interference with its occupancy of the leasehold and its use of the truck scales. A consent judgment confirmed the validity of the lease and enjoined interference with plaintiff's occupancy of its leasehold. Later, the plaintiff sued seeking damages for alleged interference with its right to use a steamline pursuant to the same lease. The right to use the steamline was neither raised in the petition nor addressed in the consent judgment in the first action. Nevertheless this court rejected a claim preclusion defense because it determined the second action was distinct from the first action. *Westway Trading Corp.,* 314 N.W.2d at 401–02.

In rejecting the claim preclusion defense, the court in *Westway Trading Corp.* reasoned that in the second action the protected right was the alleged lease right to use the steamline; the alleged wrong was the denial of such use; the relevant evidence concerned whether the right was granted in the lease and, if so, whether the defendants wrongfully denied the right. *Id.* at 401. The court further reasoned that (1) none of these matters were litigated in the first action and (2) a party is free to bring separate actions on different provisions of a single lease. *Id.*

The court in *Westway Trading Corp.* cited with approval two other cases applying the "separate and distinct" cause of action concept against a defense of claim preclusion. *Id.* In one of the two cases, *Bloom v. Steeve,* 165 N.W.2d 825, 828 (Iowa 1969), this court held that an action to collect a promissory note was not barred by an earlier action involving the right to invoke an acceleration clause in the same note.

In the first action the plaintiffs in *Bloom* were seeking to accelerate the note because of an alleged breach of a security agreement given in connection with the note. The court held that the first action—which the plaintiffs dismissed with prejudice—was not the same as the second action because the first action only adjudicated whether the plaintiff had a right to accelerate the note. *Id.* at 828. The second action, on the other hand, sought recovery for the balance owed on the note.

In the other case cited in *Westway Trading Corp.,* the plaintiff sued to recover pre-

payment charges, alleging that a governmental regulation authorizing the charge was invalid. The court concluded the regulation was valid and found for the defendant. Later the plaintiff again sued, this time seeking to recover a percentage of charges based on the regulation. The federal court of claims rejected the defendant's claim preclusion defense even though the court acknowledged the plaintiff could have joined the second action with the first action. *Forrest Village Apartments, Inc. v. United States,* 178 Ct.Cl. 490, 371 F.2d 500, 503 (1967).

The court in *Forrest Village Apartments* noted that the principles of res judicata are applied much more narrowly where the second action is predicated upon a different cause or demand from the first action. *Id.* 371 F.2d at 502. In these circumstances, the adjudication in the first action acts as a bar only as to those matters litigated and decided in the first action. The adjudication in the first action, however, does not bar matters which might have been litigated and determined. *Id.* The court recognized that causes of actions are the same for purposes of res judicata if: "(1) the same principles of substantive and procedural law are applicable to both actions; (2) the same right is alleged to be infringed by the same wrong in both actions; (3) the judgment sought in the second action would infringe rights established in the first; (4) the same evidence would support both actions; or (5) the operative facts are the same in both actions." *Id.* at 503 n. 2 (citing *Developments—Res Judicata,* 65 Harv. L.Rev. 818, 824–31 (1952)). Utilizing these five factors, the court concluded that the second claim or cause of action was separate and distinct from the claim the court considered and disposed of in the second action. *Id.* at 503.

■ 2. *The merits on claim preclusion regarding the tortious interference claim.* The foregoing principles lead us to conclude that claim preclusion does not bar Iowa Coal's tortious interference claim. We reach this conclusion for reasons that follow.

We have before us the petition in *Iowa Coal I* and the petition in the present case. Both petitions seek declaratory relief. In *Iowa Coal I,* Iowa Coal asserted the County (1) failed to develop a comprehensive zoning plan before enacting ordinance 6, rendering ordinance 6 invalid and (2) effected a taking of Star 6 and Star 14 because ordinance 6 deprived Iowa Coal of all beneficial use of the sites. We concluded (1) ordinance 6 was a validly enacted zoning law, (2) the ordinance did not effect a taking as to Star 14, and (3) Iowa Coal's claim as to Star 6 was not ripe for adjudication. *Iowa Coal I,* 494 N.W.2d at 670–72. Iowa Coal did not raise, nor did the district court adjudicate, a claim for tortious interference in *Iowa Coal I.*

In the present case, the protected right is Iowa Coal's right to contract with Metro Waste without interference from the County. The alleged wrong is the County's interference with that protected right. The relevant evidence is whether there was a prospective contractual relationship with Metro Waste and, if so, whether the County tortiously interfered with that relationship. None of these issues were litigated in *Iowa Coal I,* although concededly there was evidence before the district court in the first action from which the court could find the County interfered with this prospective contractual relationship.

Iowa Coal's tortious interference claim is separate and distinct from the claim considered in *Iowa Coal I.* The tortious interference claim is more akin to the separate and distinct actions in *Westway Trading Corp., Bloom,* and *Forrest Village Apartments.* In *Iowa Coal I,* Iowa Coal sought damages on two different theories. One theory asserted Iowa Coal was damaged because the ordinance was invalid. The second theory asserted Iowa Coal was damaged because the ordinance effected an unconstitutional taking of its property. Both theories sought the same recovery: the value of Iowa Coal's business and the loss of royalties.

The tortious interference claim, on the other hand, is based on the County's alleged tortious interference with a proposed contractual relationship between Iowa Coal and Metro Waste. This is a theory far different from the two theories relied on in *Iowa Coal I.* Additionally, the recovery sought for the tortious interference claim is far different from the recovery sought in *Iowa Coal I:*

$850,000 profit expected from the proposed contractual relationship.

In addition, the tortious interference claim neither depends on nor arises out of the same evidence supporting the invalid ordinance theory and takings theory in *Iowa Coal I*. The two theories in *Iowa Coal I* and the tortious interference theory in the second action require different proof. To sustain the two theories in *Iowa Coal I*, Iowa Coal had to prove that ordinance 6 was invalid or that the passage of the ordinance constituted an unconstitutional taking of its property. To substantiate its takings claim, Iowa Coal had to prove that passage of ordinance 6 deprived Iowa Coal of all economically beneficial or productive use of its property.

To substantiate its tortious interference claim in the present action, Iowa Coal had to prove that the County improperly interfered with Iowa Coal's prospective contractual relationship with Metro Waste. As part of that proof, Iowa Coal had to prove the County's motive in its interference was to financially injure or destroy Iowa Coal. Additionally, Iowa Coal had to prove the profits it lost from such interference.

■■■ What we have here is a situation in which the demand for recovery, the rights alleged to be infringed, and the applicable principles of law are different. Additionally, the award in the present action for the tortious interference claim would not infringe rights established in *Iowa Coal I*. In short, the causes of action or claims in the two lawsuits are not the same. In such circumstances, res judicata in the sense of claim preclusion does not bar the intentional interference claim inasmuch as such claim was not litigated or determined in *Iowa Coal I*. The fact that at Iowa Coal's option the intentional interference claim might have been litigated in *Iowa Coal I* is of no consequence. If a second suit is brought upon a different claim or cause of action, the judgment in the first action operates as a bar only to questions actually litigated and determined in the original action, not what might have been litigated and determined.

■■■ 3. *The merits on claim preclusion regarding the nonconforming use claims.*

We likewise conclude that claim preclusion does not bar Iowa Coal's claim that (1) a nonconforming use for landfilling purposes existed at Star 6 and Star 14 at the time that the County passed ordinances 6 and 7 and (2) the use continues to exist. We reach this conclusion based on the same reasoning we applied to the County's claim preclusion contention regarding the tortious interference claim.

The petition in *Iowa Coal I* does not ask for a determination of the nonconforming use status for Star 6 and Star 14. The petition in the present case does. There was no evidence presented to establish the nonconforming use status in *Iowa Coal I*. There was in the present action. In short, there was no adjudication regarding such status in *Iowa Coal I*; there was such an adjudication in the present action. (We have, however, in division IV(B)(2) of this opinion reversed and remanded for dismissal of the nonconforming use claims because Iowa Coal failed to exhaust the zoning certificate remedy in the ordinances.)

In the present case, the protected right is Iowa Coal's right to continue landfilling at the two sites under the nonconforming use provisions of the two ordinances. The issues are (1) whether the use existed at the time of the County's adoption of the two ordinances and (2) whether the use was lost through nonuse for the period prescribed under the ordinances. The relevant evidence is (1) whether Iowa Coal was landfilling at the two sites at the time the County adopted the two ordinances and (2) whether Iowa Coal discontinued landfilling at the two sites for the period prescribed in the ordinances for discontinuing a use. None of these issues were litigated in *Iowa Coal I*.

Like the tortious interference claim, the nonconforming use claims are separate and distinct from the claims considered in *Iowa Coal I*. As mentioned, in the first action, Iowa Coal sought recovery on two theories: illegal adoption of ordinance 6 and an unconstitutional taking. The theories, the recovery sought, and the applicable legal principles in *Iowa Coal I* are different from those in the present action. In addition, the nonconforming use claims in the present action

neither depend on nor arise out of the same evidence supporting the two claims in *Iowa Coal I.* Finally, any relief Iowa Coal might garner regarding the nonconforming use claims would not infringe on rights established in *Iowa Coal I.*

F. *Should the district court have dismissed the Star 15 claims for lack of evidence?* Iowa Coal asserted several claims arising from the County's actions regarding Star 15. The district court's findings of fact, conclusions of law, and judgment failed to mention Star 15.

The County contends Iowa Coal's claims arising from Star 15 should have been dismissed for lack of evidence because Iowa Coal presented no evidence at all on these claims. In response, Iowa Coal argues that the County cannot raise this issue on appeal because the County was not aggrieved by the court's failure to rule on this issue.

Only Iowa Coal could have been prejudiced by the district court's failure to rule on this claim arising from Star 15. Therefore, only Iowa Coal possesses a right to appeal on this issue. *See Wassom v. Sac County Fair Ass'n,* 313 N.W.2d 548, 550 (Iowa 1981) ("A party may appeal only from an adverse judgment."); *Wyatt v. Crimmins,* 277 N.W.2d 615, 617 (Iowa 1979) ("A party who is not aggrieved by a judgment or other ruling has no right to appeal."). Because Iowa Coal has not appealed, we give this issue no further consideration.

V. *Summary and Disposition.*

In summary, we reach the following conclusions. First, the County had no standing to challenge Iowa Coal's alleged noncompliance with Iowa Coal's leases permitting it to mine and landfill. There was no record evidence to establish that the landlords had considered the leases terminated. Therefore, contrary to the County's contention, Iowa Coal's claims predicated on those leases were viable.

Second, Iowa Coal's takings claim regarding Star 6 was not ripe for adjudication. Because Iowa Coal had not exhausted the zoning certificate remedy under the ordinances, there was no final, reviewable decision by the County regarding the use of Star 6. Such finality is a condition precedent to the ripeness doctrine in an inverse condemnation claim. Iowa Coal likewise failed to exhaust the zoning certificate remedy concerning the merits regarding Star 6's and Star 14's nonconforming use status under the ordinances. The district court therefore lacked jurisdiction to hear these matters.

Third, there is a cause of action against a municipality for tortious interference with a prospective business relationship. The applicable period of limitations for such a cause of action is five years. Iowa Coal's claim against the County for tortious interference with a prospective business relationship was brought within the five year period and was therefore filed in a timely manner.

Fourth, the district court properly overruled the County's motion for directed verdict regarding Iowa Coal's tortious interference claim. The evidence was sufficient to generate a jury question on the only element of the claim challenged by the County: intent to financially injure or destroy.

Fifth, claim preclusion barred neither Iowa Coal's tortious interference claim nor its nonconforming use claims. These claims were not the same as the claims adjudicated in *Iowa Coal I.*

Last, the County cannot challenge on appeal the district court's failure to dismiss Iowa Coal's claims regarding Star 15. Only Iowa Coal can raise that issue, and it has not appealed.

Accordingly, we reverse and remand for dismissal of Iowa Coal's takings claim regarding Star 6. We also reverse and remand for dismissal of Iowa Coal's nonconforming use claims for Star 6 and Star 14. Because Iowa Coal's and Huyser's damage awards are premised on the takings claim regarding Star 6, the district court on remand shall vacate the judgments in connection with these awards. We affirm the district court award on the tortious interference claim.

Because of the conclusions we reach and the disposition we make of Iowa Coal's claims, we need not address several other issues the County raises.

REVERSED AND REMANDED IN PART AND AFFIRMED IN PART.