**IOWA COAL MINING COMPANY, INC., Star Coal Mining Company, Inc., and Jim Huyser, Appellees,**

v.

**MONROE COUNTY, Iowa, Appellant.**

No. 91–1237.

Supreme Court of Iowa.

Jan. 20, 1993.

Rehearing Denied Feb. 18, 1993.

Lee H. Gaudineer of Austin, Gaudineer, Austin, Salmons & Swanson, Des Moines, and Annette J. Scieszinski, Sp. Asst. County Atty., Albia, for appellants.

R. Jeffrey Lewis, Joseph G. Van Winkle, and S.P. DeVolder of Gamble & Davis, P.C., Des Moines, for appellees Iowa Coal Min. Co., Inc. and Star Coal Min. Co., Inc.

James Q. Blomgren and Randall C. Stravers of Pothoven, Blomgren & Stravers, Oskaloosa, for appellee Jim Huyser.

Considered by LARSON, P.J., and SCHULTZ, CARTER, LAVORATO, and NEUMAN, JJ.

NEUMAN, Justice.

This case concerns a coal company's attempt to increase its profitability by merging its strip mining operation with a solid waste landfill. The company's zeal in pursuing the venture was exceeded only by the county's speed in enacting a zoning ordinance to restrict it. The question is whether the county thereby violated statutory zoning laws or so burdened the coal company with a regulatory taking that it is entitled to just compensation under our state and federal constitutions.

Focusing solely on the statutory claim, the district court invalidated the county's zoning ordinance and entered multimillion dollar judgments for the company and its owner. We now reverse those awards on the county's appeal.

I. *Background facts and proceedings.* Plaintiff Iowa Coal Company, and its wholly owned subsidiary, plaintiff Star Coal, are corporations having their principal place of business in Monroe County, Iowa. Plaintiff Jim Huyser is president and sole shareholder of both corporations. He also owns the leasehold interests in the mining properties. Those leases have been assigned to Star Coal in exchange for royalties paid to Huyser on the basis of tonnage mined and sold. Throughout this opinion these plaintiffs shall be collectively referred to as "Iowa Coal."

Iowa Coal is engaged in strip mining. This process, in contrast to underground mining, removes the coal closest to the surface, proceeding deeper until the cost of removing the coal (plus the "overburden") exceeds its value. Although the company had enjoyed a decade of sizable profits, by early 1987 the mining operation was only breaking even; that is, the cost of obtaining the coal product for sale was roughly equal to the sales achieved.

To counteract the impact of fluctuating coal prices and to increase its profitability, Iowa Coal embarked on a plan to merge its coal mining with a solid waste disposal operation. Iowa Coal was already engaged in the landfill business, to a limited extent, at one of its mines known as Star 6. Although relatively small (10.3 acres) and never fully developed, Star 6 held a state permit to accept coal by-products, such as fly ash. It also had a permit to accept tires.

Iowa Coal identified one of its other and much larger (350 acres) coal leases, known as Star 14, as a potential landfill site which would complement strip mining, but only if the two operations were synchronized. Traditional strip mining techniques destroy a site's usefulness for landfilling because the mine proceeds in a circular fashion around the coal outcrop, removing all the shallow coal first. To combine strip mining with a landfill, the operator must make straight cuts and remove both the shallow and deep coal to create an air space or "physical cell" where waste may be deposited. The idea is that the additional cost of excavating the deeper coal will be more than offset by fees generated upon the creation of a new resource: the large cell in which to deposit waste. Additionally,

the potential cost of this diversification is minimized by the fact that both processes (mining and landfilling) employ similar earthmoving equipment and expertise.

In January 1988, Iowa Coal sought a landfill permit from the Iowa Department of Natural Resources for Star 14. Although the proposed landfill was designed to meet or exceed existing regulatory rules, swift approval of the permit was desired to avoid compliance with the more stringent requirements of the Iowa Groundwater Act of 1987 to take effect in July 1988. Thus at the time Iowa Coal submitted its application, leachate collection and treatment systems were not required to be planned or in place before the permit could be granted. Nor did the application need to contain a plan for methane gas collection. Financial assurance plans were not yet required, nor were any plans for closure or postclosure maintenance. Iowa Coal's ability to proceed unburdened by these restrictions would not only reduce its expenses but also enhance the landfill's attractiveness to potential users.

Iowa Coal's plans did not proceed unnoticed by Monroe County residents and its board of supervisors. In October 1987, the county hired Alan Heuton, senior planner for the Area XV Regional Planning Commission, to update the county land use map. Heuton's contract expressed the county's expectation that the new map and its accompanying text "when legally adopted in accordance with chapter 358A of the Code of Iowa, shall become the Monroe County Zoning Ordinance." Heuton proceeded to make a physical inspection of Monroe County and its current land use, and studied documents previously prepared by the Regional Planning Commission. He then drafted a sixty-two page ordinance proposing permitted and conditional uses in each district, and the administration of the zoning scheme. This draft was considered by the newly appointed zoning commission at its first meeting in March 1988.

As initially, drafted, the ordinance allowed both landfilling and mining as conditional uses in an A–2 agricultural district. Star 6 and Star 14 are located in an A–2

district. After meeting with Heuton, the zoning commission revised the draft ordinance to permit landfilling as a conditional use on I–2 (heavy industrial) land only. The commission believed that the heavy traffic and equipment associated with a landfill presented environmental, safety, and road maintenance concerns best accommodated by the I–2 classification.

Several public meetings were held at which Huyser and others objected to and commented upon the proposed ordinance. Because the proposed ordinance permitted strip mining as a conditional use in both A–2 and I–2 districts, but confined landfills to I–2, Iowa Coal could continue strip mining but could not combine the operation with a landfill.

Upon vote of the commission on April 21, 1988, it forwarded the proposed ordinance to the board of supervisors for adoption. By May 12, 1988, it had been formally read by the board at three consecutive meetings and enacted into law. We shall refer to it in this opinion as "Ordinance 6."

Meanwhile, the Department of Natural Resources held public hearings on Iowa Coal's landfill permit application. The permit was not approved until May 13, 1988. Iowa Coal subsequently applied for rezoning to accommodate its planned landfill/mining operations at Star 6 and 14. The Monroe County Board of Supervisors denied the request and this suit followed.

Iowa Coal's suit against Monroe County, as amended, sought relief by way of certiorari and declaratory judgment. The petition alleged the illegality of the county's enforcement of Ordinance 6, claimed the ordinance deprived Iowa Coal of the only legitimate use of its property without providing just compensation, and sought damages. The court conducted two trials on the issues raised; the first addressed the county's alleged "liability," and the second covered damages.

Based on the facts outlined above, the district court concluded that the county violated Iowa Code section 358A.5 because it "failed to develop a Comprehensive Plan *prior to* the enactment of a Zoning Ordinance." (Emphasis added.) Without this

statutory compliance, the court ruled, the county exceeded its jurisdiction thereby rendering the ordinance void and unenforceable. The court then authorized a second trial on the damages sustained by Iowa Coal as a result of the county's "illegal and unconstitutional" acts.

In its ruling following a lengthy trial on damages, the court rested its award on plaintiff's loss of business opportunity, measured "by proof of the present value of lost profits and lost royalties that Plaintiffs would have received absent the illegal acts of the Defendants." By this standard, the court calculated Iowa Coal's loss at $10,319,526 and Jim Huyser's loss at $5,047,972, and entered judgment accordingly. This appeal by Monroe County followed.

II. *Issues on appeal.* The thrust of the county's appeal is, like the district court opinion, directed solely at the alleged statutory invalidity of Monroe County's zoning ordinance. Thus the county claims the court committed legal error when it found a statutory violation, and magnified the mistake by sustaining a private cause of action in damages for its breach. The county also attacks the size and scope of the award on other grounds, including the sufficiency of the evidence to support it and the measure by which it was calculated. Finally the county claims the award cannot stand because it violates the constitutional debt limit imposed on counties.

Iowa Coal responds by urging affirmance on constitutional as well as statutory grounds. We have recognized that a party for whom a favorable judgment has been rendered may attempt to save the judgment by urging any ground asserted in the trial court. *Scott v. City of Sioux City,* 432 N.W.2d 144, 147 (Iowa 1988); *Citizens Against the Lewis & Clark (Mowery) Landfill v. Pottawattamie County Bd. of Adjustment,* 277 N.W.2d 921, 926 (Iowa 1979). Thus the controlling issues as we see them are (1) whether the county violated Iowa Code section 358A.5 and, if not, then (2) whether Ordinance 6, as enacted, amounted to a taking of Iowa Coal's property entitling it to just compensation.

III. *Scope of review.* This combined certiorari-declaratory judgment action was tried at law in the district court. Thus our review would ordinarily be limited to the correction of errors at law. *Neuzil v. City of Iowa City,* 451 N.W.2d 159, 163 (Iowa 1990). Here we are confronted with both statutory and constitutional claims. On the statutory claim we are bound by the trial court's well supported factual findings, but not its conclusions of law. *Id.* The existence of a constitutional issue requires us to review de novo the evidence bearing on that claim. *Montgomery v. Bremer County Bd. of Supervisors,* 299 N.W.2d 687, 692 (Iowa 1980).

IV. *Discussion.*

A. *Statutory claim.* The foundation for the district court's sizable award is its finding that Monroe County did not adopt its zoning ordinance in conformity with Iowa Code section 358A.5. That section, contained in a chapter empowering county boards of supervisors to regulate and restrict land use and structures within the county, provides:

> The regulations shall be made in accordance with a comprehensive plan and designed to preserve the availability of agricultural land; to consider the protection of soil from wind and water erosion; to encourage efficient urban development patterns; to lessen congestion in the street or highway; to secure safety from fire, flood, panic, and other dangers; to protect health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to promote the conservation of energy resources; to promote reasonable access to solar energy; and to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements....

> Such regulations shall be made with reasonable consideration, among other things, as to the character of the area of the district and the peculiar suitability of such area for particular uses, and with a view to conserving the value of buildings

and encouraging the most appropriate use of land throughout such county.

Iowa Code § 358A.5 (emphasis added).

Focusing on the statute's mandate that such regulations proceed only "in accordance with a comprehensive plan," the district court found—as a factual matter—that no planning document existed apart from the county's sixty-two page zoning ordinance. It then concluded—as a matter of law—that without such a planning document, adopted prior to and independent of the zoning ordinance itself, the county was without legal authority to enact a zoning ordinance. It is this legal conclusion, not the court's factual finding, that the county challenges on appeal. We agree that the district court's narrow construction of the statute is not in keeping with the great weight of authority.

This court has not previously ruled whether a county must demonstrate written evidence of a plan as well as a zoning ordinance when it initiates countywide zoning. But in the context of *rezoning,* this court has held that compliance with the comprehensive plan requirement merely means that zoning authorities have given "full consideration to the problem presented, including the needs of the public, changing conditions, and the similarity of other land in the same area." *Montgomery,* 299 N.W.2d at 695. Noting the flexibility of this standard, the Iowa Court of Appeals recently observed that "nothing in chapter 358A requires a county to reduce a comprehensive plan to written form." *Webb v. Giltner,* 468 N.W.2d 838, 840 (Iowa App.1991). It then ruled that once a plan is adopted officials are not free to ignore it in favor of some other "comprehensive" plan of their choice. *Id.* The court reasoned that fidelity to "the" comprehensive plan, "whether inherent in the zoning ordinance or a separate written document," reduces the risk of arbitrary decision making, lending stability and predictability to the zoning process. *Id.* at 840–41.

These comments from *Webb* and *Montgomery,* though dicta and not controlling in the case before us, reflect the widely-held views of commentators in the field. Zoning "in accordance with a comprehensive plan" does not require that there be a planning document separate from the zoning ordinance itself. Vestal, *Iowa Land Use and Zoning Law* § 3.01(d) at 67 (1980). To the contrary, a comprehensive plan is traditionally evidenced by a zoning ordinance which is "precise in its terms, gives notice of its restrictions and is geographically complete." 6 P. Rohan, *Zoning and Land Use Controls* § 37.01[1][b] at 37–7 (1991). Thus the planning necessary to implement a comprehensive zoning scheme need not be reduced to writing; it may be found in the ordinance itself. McQuillin, *Municipal Corporations* § 25.78 at 287 (3d ed. 1991); 83 Am.Jur.2d *Zoning and Planning* § 17 at 48 (1992). The statutory validity of such a "self-contained" zoning ordinance must ultimately be tested, not by the existence of some freestanding planning document, but by whether the ordinance advances the community's interest rather than that of private owners. *Zoning and Land Use Controls* § 37.02[1] at 37–25.

We deem it significant that apart from the lack of an independent plan, and a generalized criticism of the speed with which Monroe County enacted its zoning ordinance, the district court found no fault with the substance of Ordinance 6. It would unduly lengthen this opinion to detail, item by item, the ways in which the zoning classifications within Ordinance 6's sixty-two pages correspond to the essential considerations listed in section 358A.5. Because the merits of the Ordinance itself are not being challenged, we believe it sufficient to say that it is comprehensive in its scope, uniform in its application to properties having similar qualities and location, and advances community needs ahead of private concerns.

■ We hold that it was erroneous for the court to invalidate Ordinance 6 on the ground no independent planning document preceded it. Iowa Code section 358A.5, in keeping with similar statutes adopted nationwide, does not mandate such procedure. *Cf. Wolf v. City of Ely,* 493 N.W.2d 846 (Iowa 1992) (reaching same conclusion re-

garding Iowa Code section 414.3, governing municipal zoning). It is sufficient—particularly when dealing with a predominantly rural area the size and population of Monroe County—that planning merely be evidenced by the ordinance itself. The district court's contrary ruling on this point, and the judgment for damages premised on its conclusions, must be reversed.

B. *Regulatory taking claim.* Left unaddressed by the district court was Iowa Coal's inverse condemnation claim. The company asserted that the enactment of Ordinance 6, and the county's subsequent refusal to rezone Iowa Coal's property to I–2 in order to permit combined coal mining and waste disposal, denied plaintiffs "the only legitimate use of their property." As a result, Iowa Coal claimed, it was forced to shut down its operation completely, causing substantial and irreparable damage.

■ In its most recent analysis of a takings claim, the United States Supreme Court equated the impact of confiscatory regulation—that is, "regulation that prohibits *all* economically beneficial use of land"—with the "permanent physical occupation" that typifies the sort of taking that has, without exception, given rise to a right of just compensation. *Lucas v. South Carolina Coastal Council*, 505 U.S. ——, ——, 112 S.Ct. 2886, 2900, 120 L.Ed.2d 798, 821 (1992) (emphasis added); *see also Fitzgarrald v. City of Iowa City*, 492 N.W.2d 659, 664 (Iowa 1992) (if some physical invasion is demonstrated there is no de minimis rule). When such a complete deprivation occurs, the fact that the regulation advances a substantial state interest, or otherwise protects the general welfare by preventing a harmful use, becomes irrelevant. The regulatory authority can only avoid compensation if it can be shown that the property owner's "bundle of rights" never included the right to use the land in the way the regulation forbids. *Lucas*, 505 U.S. at ——, 112 S.Ct. at 2899, 120 L.Ed.2d at 820.

■ Short of a physical invasion by the government, or the "total taking" conceived in *Lucas*, this court has also recognized that regulatory schemes which substantially deprive a landowner of the use and enjoyment of property may be compensable. *E.g., Fitzgarrald*, 492 N.W.2d at 663; *Easter Lake Estates, Inc. v. Polk County*, 444 N.W.2d 72, 75 (Iowa 1989); *Phelps v. Board of Supervisors*, 211 N.W.2d 274, 276 (Iowa 1973). Finding the point at which this exercise of police power becomes a taking requires a case-by-case examination. *Woodbury County Soil Conservation Dist. v. Ortner*, 279 N.W.2d 276, 278 (Iowa 1979).

This ad hoc approach calls for a test that "is essentially one of reasonableness." *Stone v. City of Wilton*, 331 N.W.2d 398, 404 (Iowa 1983). Three factors generally guide the inquiry: (1) the economic impact of the regulation on the claimant's property; (2) the regulation's interference with investment-backed expectations; and (3) the character of the governmental action. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978); *Ortner*, 279 N.W.2d at 278; *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485, 107 S.Ct. 1232, 1241–42, 94 L.Ed.2d 472, 488 (1987).

■ Despite Iowa Coal's claim to the contrary, this is not, like *Lucas*, a "total taking" case. *Lucas* involved the claim of a developer who purchased two lots on a barrier island off the coast of South Carolina specifically for the purpose of building single family dwellings consistent with the zoning then in place. Two years later the state passed a beachfront management act which barred the construction of any permanent habitable structures on the lots, thereby rendering the property valueless to the developer. *Lucas*, 505 U.S. at ——, 112 S.Ct. at 2889, 120 L.Ed.2d at 807. Remanding the case for further proceedings on whether the proposed development would violate the state's common law of nuisance, the Court ruled that when "a regulation that declares 'off-limits' all economically productive or beneficial uses of land goes beyond what [state nuisance law] would dictate, compensation must be paid

to sustain it." *Id.* at ——, 112 S.Ct. at 2901, 120 L.Ed.2d at 822.

■ Here the evidence is quite clear that the leases for Star 14 and Star 6 were acquired by Iowa Coal in anticipation of strip mining, not solid waste disposal. More importantly, the economic viability of mining, at least at Star 14, is only diminished by Ordinance 6's restriction on landfilling, not destroyed by it. The record reveals that Star 14's shallow coal reserves have not yet been mined and are, therefore, not yet burdened by the unfavorable "stripping ratios" that had made Iowa Coal's older sites unprofitable. Iowa Coal insists that to mine Star 14 in the traditional way would destroy the potential for ever developing the site for combined mining-landfill operation, the most economically beneficial use of the land. But deprivation of the most beneficial use of property does not render an otherwise valid exercise of police power a taking. *Stone,* 331 N.W.2d at 404. *See also Goldblatt v. Town of Hempstead,* 369 U.S. 590, 592, 82 S.Ct. 987, 989, 8 L.Ed.2d 130, 133 (1962); *Penn Central,* 438 U.S. at 131, 98 S.Ct. at 2662, 57 L.Ed.2d at 652–53.

■ Nor do we believe the evidence demonstrates entitlement to compensation under the three-factor substantial deprivation test of *Penn Central* and *Ortner.* Taking the factors in reverse order, we note that the nature of the government action involved—zoning to regulate, among other things, the siting of sanitary landfills—is peculiarly within the government's power to regulate the health and welfare of the community. *See Keystone,* 480 U.S. at 485, 107 S.Ct. at 1242, 94 L.Ed.2d at 488 (state's action in enforcing subsidence act to preserve structural support for surface estates above coal mines directed at significant threat to common welfare and thus "leans heavily against finding a taking"); *Stone,* 331 N.W.2d at 403 (zoning to control population density rationally furthers public welfare).

As for any claim of interference with Iowa Coal's investment-backed expectations, we have already noted in our rejection of the "total taking" claim that Iowa Coal's initial investment in Star 14 was not for the purpose of developing a solid waste disposal site. Thus the majority of its resources were already invested in expectation of strip mining. In fact, Iowa Coal's own proof suggests that its capital investment in any landfill operation would be minimized because of the similarity in equipment and essential personnel involved in both industries. *See Stone,* 331 N.W.2d at 404 (where no material is placed on site and no construction work begun, plaintiff's efforts and expenditures prior to rezoning not so substantial as to create vested right in particular land use). It also appears that the cost expended in planning and promoting this proposed landfill project paralleled, rather than predated, the county's action, further weakening Iowa Coal's claim.

Finally, we do not believe that the ordinance's projected impact on Iowa Coal's profitability outweighs the county's undisputed right to reasonably regulate land use within the county. Unlike the *Whitney* case, upon which Iowa Coal heavily relies, the regulation at issue here in no way prevents Iowa Coal from mining as before. In *Whitney,* the enactment of legislation to prohibit surface mining on the alluvial valley floor overlying plaintiff's mines effectively barred plaintiff's access to its coal reserves, thereby entitling it to compensation for a total taking of a specific coal deposit. *Whitney Benefits, Inc. v. United States,* 926 F.2d 1169, 1172 (Fed.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991). Here, Iowa Coal's reserves are still accessible. The profitability of their recovery turns as much, if not more, on market economics than any regulation imposed by the county.

In summary, we conclude that Monroe County has not substantially deprived Iowa Coal of its use and enjoyment of the Star 14 mine. Hence we find no taking upon which to sustain Iowa Coal's claim of compensation.

■ Iowa Coal's claim for the Star 6 site fails for a different reason. As noted earlier in this opinion, Iowa Coal held a valid state permit to accept certain wastes

at Star 6, and was using the mine as a landfill on a limited basis before the enactment of Ordinance 6. The ordinance expressly allows existing nonconforming uses to continue. The record reveals, however, that Iowa Coal never sought to take advantage of this section of the ordinance.

Unless a claimant exhausts available state remedies, a court is without jurisdiction to entertain a claim that the economic viability of the property has been substantially impaired by the zoning ordinance. *Bakken v. City of Council Bluffs,* 470 N.W.2d 34, 37 (Iowa 1991). Iowa Coal's claim as it pertains to Star 6 was not ripe for adjudication. Accordingly, we reverse and remand this claim for dismissal as premature. *See id.* at 38.

REVERSED AND REMANDED WITH DIRECTIONS.