**In re IOWA COAL MINING COMPANY, INC.,**
**Debtor.**

**In re Star Coal Mining Company, Inc., Debtor.**

**In re Superior Coal Company, Debtor.**

**Bankruptcy Nos. 97–1041–CH, 97–1042–CH, 97–1040–CH.**

United States Bankruptcy Court, S.D. Iowa, Southern Division.

Dec. 7, 1999.

William W. Graham, Graham Law Firm, Des Moines, IA, for Debtor.

Steven P. Wandro, Wandro & Associates, P.C., Des Moines, IA, for Petitioning Creditors.

### ORDER—PETITIONS FOR INVOLUNTARY BANKRUPTCY AND MOTIONS TO DISMISS

RUSSELL J. HILL, Chief Judge.

The Petitions for Involuntary Bankruptcy, as amended, and Requests for Appointment of Interim Trustee, and the Motions to Dismiss, came for hearing on September 17, 1998 and October 21, 1998. The petitioning creditors were represented by Steven P. Wandro, Esq., Wandro & Associates, P.C., and the debtors were represented by William W. Graham. Esq. At the conclusion of the hearing, the court took the matters under advisement upon a briefing schedule. Post-trial briefs have been filed and the court now considers the matters fully submitted.

The court has jurisdiction of these matters pursuant to 28 U.S.C. § 157(b)(1) and § 1334 and order of The United States District Court for the Southern District of Iowa pursuant to 28 U.S.C § 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The court upon review of the pleadings, evidence, briefs, and arguments of counsel, now enters its findings and conclusions pursuant to Fed. R.Bankr.P. 7052.

### FINDINGS OF FACT

1. The petitioners are bonding companies named St. Paul Fire and Marine Insurance Company (St. Paul), Merchants Bonding Company (Merchants), and United Fire and Casualty Company (United Fire) (hereinafter collectively referred to as "the petitioning creditors" or "bonding companies").

2. The debtors are three companies engaged in the coal mining and landfilling business in southeastern Iowa (hereinafter collectively referred to as "Iowa Coal" or "coal companies").

3. One hundred percent of the stock of Iowa Coal Mining Company is owned by James E. Huyser. Iowa Coal is a holding company and owns all of the stock of Star Coal Mining Company. Star Coal Mining Company is the operating company. James E. Huyser (hereinafter Huyser) is the president of both corporations. James E. Huyser is the sole stockholder of Superior Coal Company.

4. Iowa Coal engaged in the business of strip mining for coal.

5. Iowa Coal holds leases on several properties in Monroe County. These include Star 6, Star 14, and Star 15. Huyser is the lessee on all of these leases, but he assigned the leases to Iowa Coal in return for royalty payments.

6. Iowa mining statutes and regulations required the company to post security to ensure reclamation of the various property sites after completion of coal mining.

7. Iowa Coal established business relationships with each of the three bonding companies on an individual basis starting in the early 1980s. Each bonding company issued a specific bond for a particular, identifiable mining site, and each bonding company was dealt with as a separate entity. The bonds guarantee the reclamation only of those particular mining sites identified in the bonds and do not guarantee the reclamation of any other mining site.

8. Each bonding company's indemnity agreement is in the following form: (a) it contains a provision identifying the bonds subject to indemnity; (b) it contains a provision obligating Iowa Coal to indemnify the bonding company for advances made pursuant to a particular bond; (c) it empowers the bonding company to advance money to the contractors to perform work under a particular bond in order to complete the reclamation guaranteed by the particular bond; and (d) it contains a security agreement granting all rights, title, and interest in the machinery, equipment, plant, and materials and all contract rights arising out of each reclamation project.

9. The economics of strip coal mining started to change in the early 1980s. The strip mining industry became less profitable due to various factors. Iowa Coal decided to expand into the landfilling business as strip mining and landfilling are compatible businesses.

10. Iowa Coal formally entered into the landfilling business in 1984 when it obtained a sanitary landfilling permit from the Iowa Department of Natural Resources (IDNR) to landfill on 10.3 acres of a 120-acre tract of property known as the Star 6 site. This site, and a companion 350-acre tract known as Star 14, are located in Monroe County, Iowa.

11. Iowa Coal received a landfilling permit for the Star 14 site on May 13, 1988.

12. Monroe County initiated a course of conduct designed to prevent Iowa Coal from conducting a landfill operation at its mining sites. It discouraged prospective landfill customers from doing business with Iowa Coal and contacted state agencies to derail the project. Monroe County actively tried to cause Iowa Coal to fail. Monroe County also enacted prohibitive regulatory requirements which were designed to prohibit Iowa Coal's plans to operate combined coal mines and landfills in Monroe County.

13. On May 12, 1988, Monroe County enacted Ordinance No. 6. This county ordinance curtailed all nonconforming uses in existence at its adoption. This ordinance specifically designated coal mining and landfilling nonconforming uses. The revised draft of the ordinance permitted Iowa Coal to continue strip mining, but it could not combine strip mining with a landfilling operation.

14. Iowa Coal and Huyser commenced litigation against Monroe County in the Iowa District Court for Monroe County. (Iowa Coal I). This litigation challenged the validity of Monroe County zoning and sought money damages.

15. On December 27, 1989, the Iowa District Court for Monroe County, declared Ordinance No. 6 invalid. On June 19, 1991, the district court awarded Iowa Coal $10,319,526.00 for its losses and James Huyser $5,047,972.00. Monroe County appealed.

16. On September 5, 1991, the coal companies entered into a reclamation agreement with the bonding companies. The three bonding companies advanced $100,000.00 each for a combined sum of $300,000.00 to the coal companies. The coal companies agreed to advance the sum of $200,000.00. These reclamation advances were to be applied toward the reclamation of mining sites. The various sites were collectively treated as one site. This was done to allow the Department of Soil Conservation to approve a substantial reduction of the penalty amounts of the outstanding bonds. The coal companies agreed to repay the bonding companies according to terms set forth in the agreement. The agreement also provided that the coal companies would execute a real estate mortgage in favor of the bonding companies with approximately 600 acres of real estate in Monroe County serving as the collateral. The coal companies also agreed to execute an assignment of the judgment against Monroe County in favor of the bonding companies. The agreement further provided that it did not modify, alter, or release any indemnity agreement previously given to the bonding companies.

17. On September 6, 1991, a mortgage and security interest (Exh. F) was entered into between the coal companies and the bonding companies whereby the bonding companies were given a security interest in approximately 600 acres of real estate, buildings, mineral rights, fixtures, personal property, rents, and leases, all located in Monroe County. This mortgage and security interest was to secure the reclamation advances of the bonding companies.

18. On or about February 13, 1992, the bonding companies agreed to advance an additional $150,000.00. (Exh. B). This agreement provided that the other terms of the Reclamation Agreement of September 5, 1991, survived to the extent that they were not inconsistent with this modification.

19. On or about June 11, 1992, the bonding companies agreed to advance an additional $90,000.00 to the coal companies. (Exh. C). This modification also provided that all terms of the Reclamation Agreement and the February 13, 1992 Modification Agreement survived to the extent that they were not inconsistent with this Second Modification Agreement.

20. On or about October 7, 1992, the bonding companies agreed in the Third Modification Agreement to advance another $51,000.00 to the coal companies for reclamation purposes. (Exh. D). This Third Modification Agreement supplemented and modified the Reclamation Agreement and the prior modification agreements. This agreement provided that all other terms of the previous agreements survived to the extent that they were not inconsistent with this modification.

21. On January 20, 1993, the Iowa Supreme Court, in ruling on Iowa Coal I, reversed the judgment for money damages awarded by the district court and remanded the case for further proceedings regarding Star 6. *Iowa Coal Mining Co. v.*

*Monroe County*, 494 N.W.2d 664 (Iowa 1993), *cert. denied,* 508 U.S. 940, 113 S.Ct. 2415, 124 L.Ed.2d 638 (1993).

22. On May 7, 1993, Iowa Coal commenced its second lawsuit against Monroe County. This second lawsuit is known as Iowa Coal II.

23. On August 26, 1993, the coal companies and bonding companies entered into the Fourth Modification Agreement. (Exh. E). This agreement amended the previously modified reclamation agreement.

24. The attorneys for the coal companies gave notice of their attorney's lien to Monroe County and its counsel on May 31, 1994. (Exh. 25). This lien was perfected pursuant to Iowa Code § 602.10116(3) by serving notice on Monroe County and its attorney. This Notice of Attorney's Lien was filed of record with the Clerk of District Court, Monroe County, on June 1, 1994. Notice was given that these attorneys claimed a lien on any judgment and any and all sums of money due Iowa Coal and Star Coal from Monroe County in Iowa Coal I. Notice was given that the date of first representation was March 5, 1993.

25. Judgment was entered in Iowa Coal II in the Iowa District Court, Monroe County, on August 31, 1994. Judgment was entered against Monroe County in the amount of $850,000.00 for tortious interference with Iowa Coal's contract and business expectancies; $3,045,304.00 for damages for a regulatory taking of Star 6; $1,750,000.00 for damages to Jim Huyser for loss of royalties from the Star 6 site; plus interest from May 7, 1993. The coal site known as Star 14 was declared to be a legal, non-conforming use for coal mining and landfilling purposes at the time Monroe County Ordinances 6 and 7 were adopted. (Exh. X). Monroe County appealed this judgment.

26. Representatives of United Fire and Casualty Company met with Huyser while Iowa Coal II was on appeal. United Fire was aware at this time of the uncertainties involved in the appeal and that there were creditors with superior rights to those rights of the bonding companies.

27. The coal companies did not execute an assignment of judgment as provided in the Fourth Modification Agreement.

28. On February 28, 1995, Merchants commenced a lawsuit against Monroe County in the Iowa District Court for Monroe County. Merchants alleged that Monroe County engaged in a series of intentional acts designed to force Iowa Coal out of business and to financially ruin the company. This case was settled on or about August 6, 1996 for a total of $105,-000.00.

29. On August 14, 1995, four creditors of Huyser filed an involuntary petition under Chapter 7 against James E. Huyser. (Case No. 95–2432–C, U.S. Bankruptcy Court, Southern District of Iowa). This case was converted to a Chapter 11 on January 22, 1996.

30. Huyser commenced a lawsuit in the District Court of Iowa for Marion County against Iowa Coal and Star Coal during the summer of 1995. He alleged that Iowa Coal and Star Coal had failed to pay him his royalties on coal mined and he was entitled to receive $498,970.00 plus interest and costs from the defendants. On September 8, 1995, a default judgment was entered for Huyser and against the coal companies in the amount of $878,636.64 plus interest and costs. (Exh. CC).

31. Huyser's judgment against Iowa Coal and Star Coal in Marion County was filed of record on the Iowa Coal II judgment lien docket in Monroe County after the trial court's judgment entry on August 31, 1994.

32. The Iowa Supreme Court reversed and remanded in part and affirmed in part Iowa Coal II on October 23, 1996. *Iowa Coal Mining Co., Inc., Star Coal Mining Co., Inc., and Jim Huyser v. Monroe County,* 555 N.W.2d 418 (Iowa 1996). The Iowa Supreme Court affirmed the trial

court's award of compensatory damages to Iowa Coal in the amount of $850,000.00 based on Iowa Coal's claim of tortious interference with Iowa Coal's business expectancies. The Iowa Supreme Court reversed the balance of the trial court judgment regarding the takings claims on the basis that the takings claims were not ripe for adjudication because Iowa Coal had not exhausted its administrative remedies. The Iowa Supreme Court reasoned that Iowa Coal had to seek a nonconforming use certificate from Monroe County for its Star 6 and 14 sites before any claims for regulatory takings would ripen for judicial determination.

33. The Iowa District Court for Monroe County filed its Order for Distribution and Release and Satisfaction of Judgment on February 6, 1997. (Exh. Z). The judgment against Monroe County of August 31, 1994, in the amount of $850,000.00, together with interest thereon, was affirmed on appeal. Monroe County deposited $1,168,342.40, together with $231.84 as payment of court costs, with the Clerk of Court of Monroe County.

34. The distribution of proceeds was ordered as follows:

1. To William Terrell $ 34,127.99
2. To Howard R. Green Company $ 28,604.57
3. To Holland Brothers Construction $ 151,511.72
4. To R. Jeffrey Lewis and James Q. Blomgren $ 470,000.00
5. To Dan Toll $ 96,819.77
6. To Jim Huyser $1,002,849.30 or the amount remaining after payment of items 1 through 5, whichever is smaller.

35. The Iowa District Court for Monroe County adjudicated the validity and seniority of the liens and directed payment in the order of perfected lien seniority. Lienholders with claims of several hundred thousand dollars did not get paid because they were junior in time of perfection to the senior lienholders.

36. The bonding companies did not have any liens on file.

37. Huyser received $382,278.35 from the Iowa Coal II judgment proceeds. These monies were deposited into his personal bankruptcy estate.

38. The Petitions for Involuntary Bankruptcy as to each of the Coal Companies were filed on March 10, 1997.

39. On June 2, 1997, Huyser filed an amended disclosure statement and plan in his personal chapter 11 bankruptcy. The disclosure statement was approved, but the bonding companies objected to the plan on the basis that a trustee should be appointed to set aside the distribution ordered by the Iowa District Court for Monroe County. The bonding companies wanted the distributions to Iowa Coal's attorneys and Huyser set aside as preferences or fraudulent transfers. This court overruled the bonding companies' preference and fraudulent transfer objections without prejudice to the claims raised in the coal company involuntary cases filed by the bonding companies against the coal companies.

40. On October 14, 1997, a stipulation and agreement by and between the bonding companies and Huyser was filed in Huyser's personal bankruptcy case. The bonding companies withdrew their objections to the plan when two of the bonding company's claims were treated differently in the plan and their claims were revised upward in amount.

41. The order confirming Huyser's Chapter 11 Plan was entered on October 16, 1997.

42. The petitioning creditors do not wish to have the coal companies liquidated. Rather they wish to have a trustee appointed with authorization to operate these companies pursuant to 11 U.S.C. § 721.

### DISCUSSION

On March 10, 1997, the bonding companies filed petitions seeking Chapter 7 relief for Iowa Coal Mining Company, Inc., Star Coal Mining Company, Inc., and Superior Coal Company pursuant to 11 U.S.C.

§ 303. Section 303 provides in pertinent part:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> > (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute ... if such claims aggregate at least $10,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
> >
> > (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $10,000 of such claims.
>
> 11 U.S.C. § 303 (1997).

Section 101(41) defines "person" to include individuals, partnerships, and corporations. 11 U.S.C. § 101(41) (1997).

In their brief of Resistance to the Petitions for Involuntary Bankruptcy, the coal companies challenge the numeric sufficiency in the bonding companies' petitions. In particular, the coal companies claim that the bonding companies should be counted as one creditor with one claim for § 303 purposes. The essence of the argument is that the reclamation agreement, as modified, is the basis of a single debt that the coal companies owe to the bonding companies. This debt is secured by a single mortgage and security interest issued jointly to bonding companies. (Exh. F). This "joint obligation" constitutes a single claim and "the bonding companies constitute a single creditor entity for § 303(b)(1) purposes." (Deb. Br. at 9)

Not surprisingly, the bonding companies deny this contention. They argue that each company has a separate right to payment under the reclamation agreements and, therefore, each company has a separate claim. Section 101(5) states in pertinent part:

> "claim" means—
>
> > (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; 11 U.S.C. § 101(5) (1997).

Additionally, the bonding companies complain that the coal companies have failed to comply with Federal Bankruptcy Rule 1003(b). They contend that the defense of insufficient creditors must be raised in the answer to the involuntary petition and accompanied by a list of creditors, their addresses, the amounts owed, and a brief statement regarding the nature of the claims.

■ At the outset, the court finds that the alleged deficiencies in the coal companies' answers are harmless error and the bonding companies were not prejudiced by the answer. Rule 1003(b) is a joinder provision. It is generally invoked when a petitioning creditor claims that a debtor has fewer than 12 creditors. The debtor counters that insufficient creditors have filed the involuntary petition. The motion to dismiss is accompanied by a list of creditors. The petitioner is thus afforded the opportunity to contact other creditors and convince them to join in the case pursuant to § 303(c). Section 303(c) provides:

> (c) After the filing of a petition under this section but before the case is dismissed or relief is ordered, a creditor holding an unsecured claim that is not contingent, other than a creditor filing under subsection (b) of this section, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section. 11 U.S.C. § 303(c) (1997).

In this case, the bonding companies claimed in the involuntary petitions that the coal companies had more than 12 cred-

itors. Additionally, in response to interrogatories, the coal companies identified 49 creditors having claims. (Exh. EE). Prior to this writing, the cases had not been dismissed, nor had relief been ordered. The bonding companies have had ample time to join additional creditors. Consequently, the court does not attach any importance to the coal companies' failure to attach lists of creditors to their motions to dismiss. *See In re Beacon Reef Limited Partnership,* 43 B.R. 644, 646 (Bankr. S.D.Fla.1984) (discussing Rule 1003(d) which was renumbered 1003(b) by the 1987 amendments).

For different reasons than the coal companies espouse, the court finds that for § 303 purposes, the bonding companies constitute one creditor with one claim. This court finds the language of *In re Averil, Inc.,* 33 B.R. 562 (Bankr.S.D.Fla. 1983), compelling. In *Averil,* the debtor purchased stock of a corporation for a down payment and promissory notes. The issue in the case was whether a joint obligation constitutes two claims or merely one. Under Florida law, the promissory notes could only be enforced by both individuals and, as a consequence, the joint obligation constituted one claim for the purposes of § 303. *Id.* Bankruptcy Judge Britton goes on to state:

> Although the provisions of the statute examined in light of local law suggest the foregoing conclusion, *I am more persuaded by the following consideration. If we adopt the conclusion urged by the petitioners, the statutory scheme provided by § 303 would be defeated.* The evident purpose in requiring at least three creditors with three claims (unless the debtor has less than a dozen creditors) is to require at least some joint effort to launch an involuntary proceeding. If the co-owners of a single obligation qualify as separate claimants for this purpose, that legislative purpose would be frustrated. *Id.* at 563. (emphasis added).

In this case, the legislative purpose of § 303 would be frustrated by allowing the bonding companies to launch this involuntary proceeding without some joint effort with other creditors. The bonding companies, in initiating and pursuing this proceeding, have presented themselves to the court as one creditor with one claim based on the reclamation agreement. The court finds the following factors persuasive in its determination.

First, on March 10, 1997, the bonding companies filed involuntary chapter 7 petitions for each of the coal mining companies. Amended petitions were filed on April 22, 1997. Aside from the alleged debtors' names, the petitions are virtually identical. Each petition contains the same 11 paragraphs. Paragraph 6 refers to three accompanying exhibits consisting of over 80 pages purporting to evidence the creditors' claims. Nowhere in the petitions or the exhibits do the bonding companies state an amount of debt owed to each of them by each of the coal companies.

Second, in their petitions the bonding companies refer to the reclamation agreement and subsequent modifications to the agreement as a basis for their claim. (Exhs. A–E). The bonding companies have jointly advanced monies to the coal companies for "their mutual benefit" via this agreement. (Exh. A Sec. 4). Under the repayment terms, the coal companies are required to repay any bond losses, costs, attorney's fees, and unpaid bond premiums. However, the agreement and each modification specify that a lump sum will be paid over to the bonding companies without regard to additional costs. (Exh. A Sec. 12, Exh. B. Sec. 5, Exh. C Sec. 6(b), Exh. D Sec. 6(b), Exh. E Sec. 7(b)).

Third, the bonding companies allege that certain indemnity agreements and subrogation rights serve as an added basis for the claims. Exhibits were entered purporting to be evidence of claims against the coal companies. The bonding companies did not see fit to itemize the pay-

ments, or even identify for the court's benefit for which bond or company's benefit the payments were made.

Fourth, the reclamation agreement required that a mortgage on the coal companies' real estate be executed in favor of the bonding companies. The coal companies executed a mortgage and security interest jointly to the three bonding companies. (Exh. F). This fact is especially significant in that each of the indemnity agreements, which the bonding companies include as exhibits, contains a security agreement covering payments made in relation to the bonds that each issued. (Exh. G–I Assignment, Exh. J Sec. 4 & 5, Exh. K Sec. 5). It would appear that through the reclamation agreement and the subsequent mortgage and security agreement, the bonding companies have subordinated their individual rights to security for that of the group.

Fifth, it is clear that the coal companies were dealing with the bonding companies as one entity, and the bonding companies were dealing with the coal companies in the same manner. As evidenced from the reclamation agreement, mortgage, correspondence, and testimony, it is clear that the bonding companies made a concerted effort to come together to protect the bonds. This has been the ongoing relationship of the companies as far back as 1991. (Exh. A–F, Exh. BB, Exh. QQ–YY, Exh. 22, 23, Trans. at 41, 198, 263, 264). Advances that could have been made separately pursuant to the indemnity agreement were made jointly through the reclamation agreement.

Sixth, Merchants Mutual pursued a tortious interference with contract claim against Monroe County based on its bonding of Iowa Coal Mining Co. The case was settled and Merchants Mutual received $105,000.00. The bonding companies have not stated what effect this settlement has on Merchants' claim against the coal companies.

■ Standing alone, each of these factors might not persuade the court. Taken together, the court concludes that the petitioners have presented themselves as one creditor with one claim. The relationships of the bonding companies and the coal companies are so intertwined that it would be unfair for the court to attempt to disentangle them to meet § 303(b) requirements. The purpose of requiring at least three creditors to launch an involuntary case (where the debtor has 12 or more creditors) is to necessitate some joint effort between creditors. Where the petitioning creditors have been dealing with the debtors as one entity for an extended period of time, have subsumed the claimed obligations into a single agreement, and have presented themselves jointly to the court as one creditor, the legislative purpose of § 303 will be frustrated if additional creditors do not join in the petition. *Averil,* 33 B.R. at 563. Consequently, the involuntary petitions against each of the coal companies must be dismissed.

■ Even if the court found that the bonding companies had satisfied the requisites of § 303, it would still be compelled to dismiss this case pursuant to § 305. Section 305 provides the bankruptcy court with the power to dismiss a bankruptcy proceeding when it is in the best interest of the debtor and the creditors.

Section 305 provides:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
>
> > (1) the interests of creditors and the debtor would be better served by such dismissal or suspension; 11 U.S.C. § 305 (1997).

The exercise of this power is not reviewable by the courts of appeal or the Supreme Court of the United States. 11 U.S.C. § 305(c). Therefore, the power to dismiss or abstain is an extraordinary power, which should only be exercised in extraordinary circumstances. *In re Manchester Heights Associates,* 140 B.R. 521, 522 (Bankr.W.D.Mo.1992). "Nonetheless ...

this court will not hesitate to abstain where such action is called for." *Id.*

In determining whether to exercise the § 305 power, some courts have formulated a three-part test, while other others have employed multiple factors. *See In re Iowa Trust,* 135 B.R. 615, 621–622 (Bankr.N.D.Iowa 1992) (discussing different approaches for determining the appropriate use of § 305). However, the statute requires only that the best interests of both the debtors and the creditors be served. *Manchester Heights,* 140 B.R. at 523. This court believes that it is in the best interests of the debtors and all the creditors that the involuntary case be dismissed.

It is in the debtors' best interests because if the involuntary · petition is dismissed, the debtor coal companies will continue to exist. They will be able to retain current management and be able to pursue landfilling operations. The coal companies will surely maintain that survival is in their best interests. Additionally, the court may presume that because the debtors requested dismissal, it is their best interest. *Id.* It is, therefore, left to the court to determine the best interests of all the creditors.

The court begins by noting that the coal companies have reached agreements with their other creditors. No creditor is pressing them for payment at the present time. (Exh. EE, Trans. at 350). In fact, the petitioning creditors have not made a formal demand for payment or attempted to reduce their claim to judgment. (Trans. at 314).

At the close of the hearing on the motion to dismiss, the court put some pragmatic questions to the bonding companies' counsel and requested both parties to submit post-hearing briefs. The court asked for an assessment of what assets, if any, the requested interim trustee would administer if the involuntary case were allowed to proceed. The bonding companies' counsel identified three major assets: the potential income stream from the Star 6 and Star 14 sites when used for landing

filling purposes, the potential judgment awards from the ongoing state and federal litigation with Monroe county, and the avoidance of alleged preferences made from the Iowa Coal II judgment. (Trans. at 413–425). The court considers each of these potential assets in turn.

Clearly, the greatest asset of the coal companies is the potential award in the state and federal litigation. The companies are represented by skilled counsel who have represented them successfully for many years. There appears to be a mutual trust between counsel and the coal companies' principal James Huyser. The bonding companies agree that "[t]he persistence and talent of these attorneys have been amply demonstrated by their success in the state litigation. It is reasonable to conclude therefore that the plaintiffs' chances of success in the federal litigation is more than just a possibility." (Pet. Memo. In Support at 27). The bonding companies have suggested that an interim trustee could hire the Lewis Firm to continue the litigation, while at the same time pursuing a preference action against them. The court agrees with the coal companies and is somewhat skeptical that both avenues could be pursued. Jeffrey Lewis stated at trial that the litigation has years of background, and the accompanying documents essentially fill a room. He additionally stated that any delay. might adversely affect the ability of the litigation to go forward. (Trans. at 232–3). It would be quite difficult for an interim trustee to pursue this litigation. Additionally, Huyser has stated that he will not remain actively involved in the litigation if the coal companies are forced into bankruptcy. (Trans. at 374).

The court believes that litigation with Monroe County provides a potentially significant source of revenue that can be used to satisfy all of the coal companies' creditors. A trustee's appointment of new counsel and the absence of the primary witness, James Huyser, would seriously

handicap the current litigation and any chance for recovery.

The second major source of revenue to pay creditors is the landfilling operation. The bonding companies have moved in their position from claiming that Star 6 and Star 14 are virtually worthless, to stating (based on testimony of debtors' witness, David Bergan) that they represent a combined value of $34 million with a potential income stream of $13 million before interest and taxes.[1] (Pet.Memo. In Support at 24). The bonding companies claim that the trustee can manage these assets for the benefit of all creditors. The coal companies claim that the permits that allow landfilling are grandfathered and personal to James Huyser, and they are not transferable. The bonding companies counter that the trustee can hire Huyser to continue the operation. This court is skeptical that Huyser would be so inclined after having control of the companies wrested away in bankruptcy. Consequently, the value of the landfilling operation is, at this point, highly speculative.

The bonding companies claim that the distribution of $1,168,342 from the Iowa Coal II litigation by the Iowa District Court to certain creditors may constitute preferences, and a trustee should be appointed to determine whether any preferences have taken place. They are particularly concerned with $387,277.99 distributed to Huyser and $470,000 distributed to the Lewis law firm. (Pet. Memo. In Support at 24–5). The bonding companies suggest that the liens under which the payments were made are defective. They suggest that Huyser's judgment was procured through fraud and that the Lewis firm's lien was unperfected.

 Huyser received a default judgment against the coal companies in the amount of $878,636.64 from Iowa District Court for Marion County for back wages and fees. He then transcribed the judgment to Monroe County. The bonding companies contend that the act of obtaining this judgment is a transfer and therefore voidable under § 544(b). Essentially, they suggest that the bankruptcy court can vacate the Marion county judgment. They are in error. "Under the Rooker–Feldman doctrine, lower federal courts lack the jurisdiction to engage in appellate review of state court determinations." *Goetzman v. Agribank, FCB*, 91 F.3d 1173, 1177 (8th Cir.1996); *see also Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). This court has no power to vacate a state court judgment. *In re Alpern*, 191 B.R. 107, 110 (N.D.Ill.1995). The state appellate courts are the proper places to test the validity of Huyser's judgment. *Goetzman*, 91 F.3d at 1178.

It is important to note that the bonding companies had opportunity to raise the issue of Huyser's judgment at the confirmation of his personal chapter 11 plan. However, they withdrew their objections to confirmations in return for two of the companies moving up in class. (Exh. 22, 23). The bonding companies' suspicions concerning the validity of Lewis Firm's lien are equally unfounded.

The bonding companies contend that the Lewis Firm's attorney lien is unperfected. (Pet.Mem. In Support at 22–3). They are concerned that it was filed with the Monroe county clerk of court prior to the rendering of judgment in Iowa Coal II. They claim that this is in violation of Iowa Code 602.10116(4) and as such is not a valid lien. However, the coal companies and Jeffrey Lewis, in testimony and documents, have insisted that the lien was perfected under Iowa Code 602.10116(3) which provides

---

1. The court notes at this point, if petitioners' valuation of $34 million on the two sites is correct, they are fully secured by the mortgage and security interest agreement executed by James Huyser pursuant to the reclamation agreement. Therefore, their alleged claims would not be $10,000 more than the value of the lien on property securing their claims, and their petitions would be dismissed.

that an attorney's lien is valid "from the time of giving notice in writing to such adverse party, or attorney, which notice shall state the amount claimed, and in general terms, for what service." The filing of the notice with the Monroe clerk has put other potential creditors and the general public on notice of the lien. The Iowa District Court for Monroe county found that the lien was valid and distributed $470,000 to the Lewis firm. It is very doubtful that a trustee would pursue these monies.

Finally, even if the motions to dismiss are denied, the coal companies will have the opportunity to convert the cases to chapter 11. Section 706, in part, provides:

(a) The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable. 11 U.S.C. § 706 (1997).

Huyser, in his personal bankruptcy case, has already shown his willingness to convert an involuntary chapter 7 to chapter 11. The court anticipates that as principal of the coal companies, he would do the same. Such a conversion would add additional costs and delay.

The court finds that the creditors will have a better chance of repayment in full if the coal companies remain in control of their assets and pursue landfilling operations and the ongoing litigation. For all the foregoing reasons, the court holds that both the debtor corporations and all of their creditors would be better served by the dismissal of this case.

The coal companies request costs, attorney's fees, compensatory, and punitive damages pursuant to 11 U.S.C. § 303(i)(1) and (2). This section provides:

(i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

(1) against the petitioners and in favor of the debtor for—

(A) costs; or

(B) a reasonable attorney's fee; or

(2) against any petitioner that filed the petition in bad faith, for—

(A) any damages proximately caused by such filing; or

(B) punitive damages. 11 U.S.C. § 303(i)(1), (2) (1997).

The operative word in this section is "may." The assessment of costs or damages against the petitioners is entirely within the court's discretion, *In re Nordbrock,* 772 F.2d 397, 400 (8th Cir.1985), and the court is not inclined to make such an assessment in this instance. The petitioners were justifiably alarmed and suspicious when the Iowa Coal II proceeds were distributed without notice to them. They felt that they had 90 days in which to act. Consequently, the court cannot say that the petitions were filed in bad faith. Additionally, § 303(i) costs, fees, and damages are not available in a case dismissed under § 305. *In re Sun World Broadcasters,* 5 B.R. 719, 723 (Bankr.M.D.Fla.1980), *but see In re Kidwell,* 158 B.R. 203, 216–217 & n. 22 (Bankr.E.D.Cal.1993) (plain language of the statute makes § 303(i) applicable to § 305).

### ORDER

IT IS ACCORDINGLY ORDERED as follows:

1. The Motions to Dismiss Complaint for Involuntary Bankruptcy by Iowa Coal Mining Company, Inc., Star Coal Mining Company, Inc., and Superior Coal Company are GRANTED.

2. The Requests by Iowa Coal Mining Company, Inc., Star Coal Mining Company, Inc., and Superior Coal Company for costs, attorneys' fees, and damages are DENIED.

674

3. All other Motions, Requests, and Objections in this case are moot.